THIRD DIVISION
November 24, 2010

No. 1-10-1407


| | | |
|---|---|---|
| *IN RE* JOSHUA K., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| Leanne D., | ) | Honorable |
| | ) | Richard A. Stevens, |
| Respondent-Appellant). | ) | Judge Presiding. |


PRESIDING JUSTICE QUINN delivered the opinion of the court:

Respondent Leanne D. appeals the judgment of the circuit court terminating her parental

rights to her minor son Joshua K.[1]  On appeal, respondent contends that the trial court erred in

finding that she was unfit to parent Joshua and that terminating her parental rights was in

Joshua's best interests.  For the reasons set forth below, we affirm the circuit court.

I. BACKGROUND

Joshua was born on March 14, 2006.  A little less than a year later, on March 6, 2007,

---

[1]The circuit court also terminated the parental rights of Joshua's natural father, David K.  The cases were

originally consolidated on appeal but were subsequently unconsolidated, so David K. is not a party to this appeal.

respondent took Joshua to a bar after attending a St. Patrick's Day parade. Respondent became intoxicated, and a bar patron who thought respondent was too drunk to care for Joshua called the police. Respondent was arrested and charged with child endangerment, and Joshua was placed in the temporary custody of the Department of Children and Family Services (DCFS). Respondent told a DCFS case worker at that time that she could not control her consumption of alcohol and had experienced several blackouts. An adjudication hearing was held on August 28, 2007, after which the court entered an order stating that Joshua was in an injurious environment as a result of abuse or neglect inflicted upon him by a parent. On October 31, 2007, the court adjudicated Joshua a ward of the court and placed him under DCFS guardianship, finding that respondent was unable to care for him.

After a permanency planning hearing on February 6, 2008, the court entered a goal of return home. However, after a subsequent permanency hearing on July 21, 2008, the court changed Joshua's goal to substitute care pending a court determination on termination of parental rights. The court found that respondent had relapses with alcoholism and failed to make progress toward correcting the condition that led to the removal of Joshua from her care. Another permanency planning hearing was held on April 16, 2009, and after hearing testimony from respondent and her DCFS caseworker, the court again changed the permanency goal to return home within 12 months. The court added, however, that "concurrent planning should be made for termination of parental rights and adoption."

On March 23, 2009, the State filed a motion to terminate respondent's rights to parent Joshua and to appoint a guardian with the right to consent to adoption. The petition alleged that

respondent was unfit in that she (1) failed to maintain a reasonable degree of interest, concern or responsibility for Joshua's welfare (750 ILCS 50/1(D)(b) (West 2006)); (2) failed to protect Joshua from conditions in the child's environment injurious to the child's welfare (750 ILCS 50/1(D)(g) (West 2006)); (3) was a habitual drunkard and/or addicted to drugs other than those prescribed by a physician for at least one year immediately prior to commencement of the termination proceedings (750 ILCS 50/1(D)(k) (West 2006)); and (4) failed to make reasonable efforts to correct the conditions which were the basis for Joshua's removal from her and/or failed to make reasonable progress toward his return to her within nine months after the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii)(West 2006)) or within any nine-month period after the finding of adjudication (750 ILCS 50/1(D)(m)(iii)(West 2006)). The petition also alleged that terminating respondent's parental rights and appointing a guardian with the right to consent to adoption would be in Joshua's best interest because he had resided with his foster parent since April 30, 2007, and she wanted to adopt Joshua.

The court commenced the unfitness hearing on September 17, 2009. Respondent testified that on March 3, 2007, she took Joshua to a St. Patrick's Day parade and then to Healy's Westside Tavern in Forest Park, Illinois. She said that she drank two beers and had been at the bar for an hour when police arrived, arrested her, and charged her with child endangerment. Respondent admitted that she is an alcoholic and was intoxicated on the day of her arrest. Respondent testified that following a substance abuse assessment, she completed a recommended 28-day substance abuse program called SHARE in May 2007. She was then transferred to the Lutheran Social Services of Illinois (LSSI) recovery home. On May 29, 2007, five days after

entering the LSSI program, respondent drank a pint of vodka, was found intoxicated outside, and taken by ambulance to the hospital. Respondent was discharged from the LSSI program and referred to another inpatient program at Gateway Foundation. Respondent was admitted to Gateway in June 2007 and said that she remained there for 58 days and completed the program.

In September 2007, respondent enrolled in an outpatient substance abuse program called Pro Care but was discharged following a November 28, 2007, relapse when she drank 1.5 liters of wine, resulting in hospitalization. Respondent testified that she made suicide threats at that time but does not recall making them because she had blacked out from drinking too much alcohol. On December 21, 2007, respondent again enrolled in Gateway for a 90-day in-patient stay but had a relapse on February 5, 2008, when she went to a restaurant and drank three glasses of wine. Respondent was discharged from Gateway on March 19, 2008, and that same day went to Safe Haven for additional inpatient treatment. However, two days later respondent was discharged from Safe Haven for bringing alcohol onto the premises. On March 31, 2008, respondent entered an inpatient treatment center called Passages in Malibu, California. Respondent stayed there for 30 days and returned to Chicago in early May 2008. On May 7, 2008, respondent enrolled for a second time in Pro Care's outpatient program and completed the program in November 2008. Respondent had a boyfriend while she was in the Pro Care program, and she testified that on July 22, 2008, he attempted to strangle her. Respondent relapsed the next day by drinking two wine spritzers. Respondent's caseworker recommended that respondent receive domestic violence counseling and respondent stated that she went to Sarah's Inn twice but did not return because she did not think it was necessary. Respondent

testified that she had not had any alcohol since her July 23, 2008, relapse. She also stated that as a result of her drinking, the Illinois Department of Professional Regulation suspended her nursing license for six months, followed by a two-year probation during which time she is randomly tested for alcohol. Respondent stated that she had not tested positive for alcohol during that period.

Carla Howard, the family's DCFS caseworker since March 2007, testified. She explained that Joshua "came into the system" when respondent was charged with child endangerment after she took Joshua to a bar and became intoxicated. Howard conducted an assessment and determined that respondent needed residential substance abuse treatment, parenting classes, a psychological evaluation and medication monitoring because she was taking psychotropic medication. She gave respondent a service plan listing the tasks and services respondent needed to complete to make progress toward the goal of returning Joshua home within 12 months. Progress on the service plan was evaluated every six months. In September 2007, Howard evaluated respondent from May 2007 to September 2007 and rated her progress as unsatisfactory because respondent had three relapses during that period and did not complete services.

In March 2008, Howard again evaluated respondent's progress on tasks for the goal of returning Joshua home for the period since September 2007 and again rated her unsatisfactory because she did not complete treatment or maintain sobriety. Howard testified that on November 30, 2007, respondent arrived 30 minutes late for a scheduled visit with Joshua and was intoxicated. Howard also stated that she received a progress report from respondent's therapist in December 2007, recommending that respondent receive intensive outpatient treatment because

"she superficially addresses issues" and "has not yet reached a point in her life where she is ready to realistically invest in sobriety." Howard also testified that on March 27, 2008, respondent attempted to visit Joshua during the father's scheduled visitation time and that she was intoxicated and was asked to leave.

On September 15, 2008, Howard evaluated respondent's progress from March 2008 to September 2008 and again rated her overall progress as unsatisfactory due to a relapse in July 2008, following the domestic violence incident with her boyfriend. Howard testified that between August 28, 2007, and May 28, 2008, and May 29, 2008, to February 28, 2009, she did not recommend unsupervised visits for respondent and Joshua because respondent had not maintained sobriety long enough to ensure Joshua's safety. She also testified that she did not recommend that Joshua be returned home at that time for the same reasons.

On cross-examination, Howard testified that beginning in April 2009, respondent had been visiting with Joshua weekly for 1½ hours each time at various locations, including the park and the library, and that Joshua seemed to enjoy the visits. Howard stated that prior to the July 2008 relapse, respondent had been sober for three months and that she was not aware of any subsequent relapses. Howard also said that since becoming respondent's caseworker, she noticed that respondent had become a more independent and positive person.

After the State rested, the court granted respondent's motion for a directed finding on the allegation that respondent was a habitual drunkard (750 ILCS 50/1(D)(k) (West 2006)). The court found that although there may have been one or two incidents where respondent relapsed, there was not evidence of habitual drinking, drug use or intoxication, particularly since

respondent had not had a drink since July 2008.

Respondent called Sabrina Rowe, her recovery coach from Treatment Alternatives for Safe Communities (TASC), to testify on her behalf. Rowe testified that she was assigned to respondent in early 2008, was removed from the case in July or August 2008, when the permanency goal was changed to adoption, and then was reassigned to the case in June 2009, when the permanency goal was changed back to return home. As respondent's recovery coach, Rowe monitored respondent's participation in recovery management services, such as 12-step programs, and conducted random urine tests. Rowe said that during the first period of working with respondent in 2008, she had no positive urine tests, but acknowledged that there were occasionally missed tests due to conflicts in their schedules. Rowe testified that respondent had three relapses while she was working with her and always expressed remorse following a relapse. Rowe said that when she worked with respondent the second time, in 2009, she noticed that respondent was more calm, focused, and positive, more willing to discuss her relapses and take ownership of her behavior. Rowe said that since June 2009, respondent had been given five urine tests, all of which came back negative. She also said that respondent was involved in a SMART recovery program, which is an alternative to a traditional 12-step program, and that reports from respondent's DCFS worker state that respondent was attending Alcohol Anonymous (AA) meetings.

On cross-examination, Rowe acknowledged that because she was not assigned to respondent's case from June 2008 to June 2009, she did not receive information regarding respondent's random urine tests or her progress with substance abuse treatment plans during that

time. She also acknowledged that respondent's urine tested positive for alcohol on August 16, 2007, and September 21, 2007, and that she refused to submit a random drop on November 4, November 26, December 14 and December 31, 2007, which were considered positive results. She also did not administer any random urine tests on respondent from March 2008 to April 2008, because respondent was in a recovery program in California, or on May 8, 2008, becausse respondent was unavailable. Rowe also acknowledged that in January 8, 2008, June 6, 2008, and July 28, 2008, she had written in TASC court reports that respondent demonstrated a minimum commitment toward recovery because respondent was experiencing relapses and having difficulty sustaining her recovery.

Respondent testified on her own behalf. She said that when Joshua came into the juvenile court system in March 2007, she was drinking two to three times per week, but had, as of the date of the hearing, abstained from alcohol for 14 months. She said that after her July 23, 2008, relapse, she went to 90 AA meetings in 90 days, found a sponsor, started attending SMART recovery program, and "working" the 12 steps of AA. She said that she no longer had the same circle of friends as when she was drinking, that she had gained an understanding of how alcohol made her life unmanageable, and that she knew she could not have even one drink of alcohol. She said that when she gets urges to drink she works out vigorously, attends an AA meeting, or calls her sponsor. She also stated that she talks to her sponsor once a day, meets with her sponsor once a week and feels like she has the control to abstain from drinking alcohol.

After hearing the evidence and arguments from both sides, the juvenile court found that the State proved by clear and convincing evidence that respondent was unfit to parent pursuant to

section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii)(West 2006)), because she failed to make reasonable progress toward the return of Joshua home during the nine-month period following the adjudication of neglect, which ran from August 28, 2007, to May 28, 2008. The court noted that although respondent had made reasonable efforts toward recovery, she was in and out of treatment during that period and had not recovered successfully. Therefore, the court concluded "it's clear that for that first nine-month period there has to be a finding of unfitness."

The court also found, pursuant to section 1(D)(m)(ii) (50 ILCS 50/1(D)(m)(iii) (West 2006)) that the State failed to prove by clear and convincing evidence that respondent did not make reasonable progress during the second nine-month period following the adjudication of neglect, which ran from May 29, 2008, to February 28, 2009, because during the majority of that time she was in successful recovery. It also found that respondent was not unfit pursuant to section 1(D)(b) (50 ILCS 50/1(D)(b) (West 2006)) (failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare) or section 1(D)(g) (750 ILCS 50/1(D)(g) (West 2006)) (failure to protect the child from conditions within his environment injurious to the child's welfare). Going forward, the court said, the goal would remain return home within 12 months and that if respondent maintained her sobriety her parental rights likely would not be terminated. The court also entered a new visitation order allowing visitation at the discretion of DCFS and ordered mediation between respondent and Joshua's foster parent regarding visitation and permanency.

On January 7, 2010, the court commenced a hearing to determine whether termination of

respondent's parental rights was in Joshua's best interests. The State's first witness was Mishawn Kelly, Joshua's foster mother since April 2007. Kelly testified that she is not married, that she and Joshua live in a five room, two-floor house, and that Joshua has his own room. Kelly said that she is an accountant and works regular hours of 9 a.m. to 5 p.m. Joshua attends a Catholic preschool and participates in an extended after-school program. He also attends Sunday school and is involved in the church. Kelly testified that her mother and father take care of Joshua on days when he does not have school but she has to work. She also said that Joshua calls her "mommy" and calls her mother and father "grandma" and "granddaddy." Joshua calls respondent "mama." Kelly said that her best friend is Joshua's godmother and that he considers his godmother's daughter his sister. Kelly testified that Joshua considers her friends from church to be his "grandmas or nanas or aunties" and that they all go out to dinner almost every Sunday. Kelly took Joshua on church-related trips to Texas and to Wisconsin and also took him to Baltimore to visit a friend. Kelly testified that when Joshua first came to live with her he was quiet and reserved but that he is now very friendly, well-liked, smart, and inquisitive.

Kelly testified that Joshua participates in an indoor soccer league and that because it was recommended during mediation that respondent's visits with Joshua increase from monthly to weekly, she invited respondent and respondent's father to attend Joshua's soccer practices. She testified, however, that after respondent began to attend Joshua's soccer practices in December 2009, Joshua's behavior regressed; he urinated on himself when he got home and was afraid to be out of her presence when she went to another room of the house. Kelly testified that she wants to adopt Joshua and that if respondent's parental rights were terminated she would allow

Joshua to have contact with respondent at least once a month and during holidays because she did not want to cut off all ties with his family and believed it was good for him to know his background and history.

On cross-examination, Kelly stated she is familiar with guardianship and would consider private guardianship rather than adoption. However, when she was recalled as a witness by the State on April 12, 2010, Kelly testified that she preferred adoption over guardianship because Joshua's anxiety had increased and she thought adoption would provide the consistency and stability he needs in his life. Kelly said that she knew that if she adopted Joshua, the court could not order her to maintain contact with Joshua's biological parents, but she did not know that if guardianship were ordered, the court would order that Joshua visit his biological parents once a month. She reiterated, however, that if respondent's parental rights were terminated, she would not want to cut off ties with his natural parents.

The State's next witness, Martha Leticia Cruz, Joshua's therapist, testified that she has been seeing Joshua once a week since September 2, 2009. Cruz said that she diagnosed Joshua with anxiety adjustment disorder, meaning he has problems adapting to new situations or to situations that might be stressful for him. She has engaged in play therapy with Joshua to help him express his feelings, experiences, and thoughts with adults. Cruz said that when Joshua first started therapy, he refused to talk about respondent but did talk about his "wonderful relationship" with his foster mother and said that he loves her and that she loves him back. Cruz said that Joshua's foster mother provides structure and proper discipline and those factors contribute to his feelings of love and security. On cross-examination, Cruz testified that she has

tried to facilitate successful visits between Joshua and respondent and to decrease his anxiety level about visiting her, but that she has not seen any improvement since she began working with Joshua. Cruz said that Joshua's anxiety may increase if he is removed from his foster home. Cruz acknowledged that she has not discussed Joshua with respondent and has not observed interactions between respondent and Joshua.

Miguel Casanova, a member of the Forest Park fire department, testified that on December 11, 2009, he and his partner responded to a call of a possible overdose at a home in Forest Park, Illinois. Casanova said that when they arrived at the home, respondent told them that she drank a lot of vodka that day and she was then taken to Rush Oak Park Hospital.

Court Appointed Special Advocate (CASA) Jenna Merz testified that she has been the assigned CASA volunteer on Joshua's case since November 2009. Merz submitted a report to the court recommending that respondent's parental rights be terminated because she thinks Joshua needs a permanent home "sooner [rather] than later" and because of respondent's continual problems with substance abuse. She also concluded that Joshua's foster mother provides a secure and stable home for him.

Carla Howard, the family's DCFS caseworker, who testified at the adjudication hearing, testified again at the best interests hearing. Howard stated that on January 10, 2010, she met with her supervisor, her clinical manager, and her regional administrator to discuss how to reduce Joshua's anxiety about his visits with respondent, and they decided that visits would occur in the DCFS office rather than in respondent's home. Howard said that Joshua told her in February 2010 that he wanted to stay with his foster mother and did not want to move. Howard asserted

that Joshua needs permanence, stability, and structure in his life and that some of his anxiety is caused by his uncertainty about his future. Howard testified that she most recently met with her supervisor on April 9, 2010, to discuss Joshua's case and that they decided to recommend that parental rights be terminated with a permanency goal of adoption. Howard said that this recommendation was made because Joshua is in a preadoptive home and had the opportunity for a stable, loving, nurturing home, where he would be consistently provided for.

On cross-examination by the public guardian, Howard testified that respondent had relapsed in March 2010 and was admitted to a 28-day inpatient treatment program, which she completed on April 10, 2010. Howard said that respondent was considering options for a live-in program. Howard also said that although the court had granted respondent unsupervised day visits at the discretion of DCFS, respondent only had brief periods of unsupervised time with Joshua while in the DCFS office, and that unsupervised visits had not been implemented because of Joshua's anxiety.

The State next called respondent as a witness, who testified that she had relapsed by drinking alcohol three times since December 2009. On December 11, 2009, respondent was taken to the hospital by ambulance after drinking 750 milliliters of wine. Afterwards, she attended outpatient services at Pro Care. Respondent testified that she relapsed again in February 2010, while receiving outpatient treatment and was hospitalized in March 2010, after drinking 1,500 milliliters of wine and vodka. Respondent stated that she did not tell her DCFS caseworker about her December 2009 relapse, but instead told her that she had hit her head. On cross-examination by the public guardian, respondent testified that she had suicidal thoughts and

spoke to counselors at SHARE about this, but was not currently receiving mental health treatment.

Respondent called Leo Paul Gormley, a rehabilitation counselor with the SHARE program, as a witness. Gormley testified that he had been respondent's counselor since March 20, 2010, and that respondent successfully completed the 28-day SHARE program and agreed to follow up with outpatient services at Pro Care. Gormley said that respondent had made a lot of progress during the SHARE program in developing a belief that she could be sober and in improving her self-esteem and her ability to identify triggers that might cause a relapse. Gormley spoke with respondent about her history with alcohol and her relapses, particularly the one that occurred in March 2010, following 18 months of remaining sober. He said that in his opinion, she relapsed because she stopped working a program of recovery and had a lot of anxiety due to child custody issues and her inability to work as a nurse. Gormley worked with respondent to develop a plan for preventing relapses and opined that her prognosis was good if she follows through on her aftercare plan and her continuing care recommendations.

Respondent testified on her own behalf. She reiterated how the case came into the juvenile court system as well as her history of alcohol treatment and relapses. She testified that until December 2009, she had been sober for 18 months and that between September 2009 and December 2009, she was having weekly visits with Joshua at her apartment, the library, the park or the mall. Her father also visited with Joshua once a month. Respondent testified that she attended a mediation session in October 2009 and reached an agreement that provided that: (1) the foster parent and respondent would continue to speak with each other at least once a month

about Joshua; (2) respondent's weekly visits would be supervised by Carla Howard and all parties would assess Joshua's comfort level so that Howard could eventually remove herself from visits; (3) respondent, the foster parent, Carla Howard and Martha Cruz, Joshua's therapist, would speak monthly to discuss his behavior and how changes in visitation might be impacting him; and (4) respondent and her father would attend Joshua's Saturday morning soccer practices.

Respondent testified, however, that she did not think that Carla Howard, Martha Cruz, and Joshua's foster mother were complying with the agreement because after she and her father attended three of Joshua's soccer practices, Carla Howard would not allow them to continue to attend because Joshua wet his pants afterward. She also stated that the monthly telephone conferences between her and Joshua's foster mother, as well as the monthly telephone conferences with Joshua's foster mother, caseworker, and therapist never took place. Respondent testified that she was not getting support to achieve the goal of return home and as a result she was feeling sad, despondent, frustrated, resentful and hurt. She said that she "started isolating" and not getting out of her apartment as much as she should have and not reaching out to others. She said that as a result of these feelings, she relapsed on December 11, 2009, February 2010, and March 2010. Respondent testified that she was feeling fearful that she was going to lose her son and that she was hard on herself due to her relapses.

Respondent testified that after her relapses, she successfully completed the SHARE program and started intensive outpatient treatment at Pro Care on April 13, 2010. She also testified that since her discharge from the SHARE program she has obtained a sponsor and attends AA meetings, although not required to do so. Respondent produced log sheets from the

AA meeting she attended between April 10, 2010 and April 20, 2010, as well as results from negative "drug tox screens" from April 14 and April 19, 2010, and photos of her and Joshua from visits on April 16, 2010, and Christmas 2009. She testified that she has had telephone visits with Joshua while she was in the SHARE program and subsequent in-person visits, at which time Joshua was very affectionate with her and called her "mama." She also testified that in October 2009, prior to her relapse, she went to Sarah's Inn for domestic violence counseling and implemented the safety plan the counselors gave to her. On cross-examination, respondent testified that she took Antabuse from May 2008 to October 2008 and from November 2009 to December 2009 and that if she drank alcohol while on Antabuse, she would get a rapid heart rate and a rash. She also acknowledged that she was involuntarily admitted to Oak Park Hospital in February 2010.

On April 21, 2010, after closing arguments from both sides, the court issued its ruling. The court noted that Joshua had been in the care of his foster mother for almost three years and was attached to her. The court also stated that respondent was not in a position to have Joshua returned to her. The court noted that although respondent had only relapsed once in the previous three months and relapses are a part of recovery, it could not ignore her relapses in considering Joshua's need for permanency. Therefore, the court entered an order finding that the State met its burden of showing by a preponderance of the evidence that it was in Joshua's best interests to terminate respondent's parental rights and set a new permanency goal of adoption. On May 2, 2010, respondent filed motions to stay adoption, to reconsider, and for visitation, which the juvenile court denied. On May 17, 2010, respondent filed a timely notice of appeal from the

juvenile court's findings at the unfitness and best interest hearings.

## II. ANALYSIS

Petitioner first contends that the trial court erred in finding that she was an unfit parent. In particular, petitioner argues that the trial court's finding that she failed to make reasonable progress toward Joshua's return home during the first nine-month period following the adjudication of neglect was against the manifest weight of the evidence. The State asserts that because respondent failed to maintain sobriety, was repeatedly discharged from treatment programs, and arrived intoxicated for visits with Joshua during the nine months after adjudication of neglect, the juvenile court correctly found that she was unfit to parent under section 1(D)(m)(ii) of the Illinois Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2006)).

The Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 2006)) provides a two-step process for the involuntary termination of parental rights. In re C.W., 199 Ill. 2d 198, 210 (2002). First, the State must prove that the parent is unfit as defined in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2006); In re C.W., 199 Ill. 2d at 210. Because the termination of parental rights constitutes a complete severance of the parent-child relationship, proof of parental unfitness must be clear and convincing. In re C.N., 196 Ill. 2d 181, 208 (2001). Only if the court makes a finding of unfitness will the court go on to consider whether it is in the best interest of the child to terminate parental rights. 705 ILCS 405/2-29(2) (West 2006); In re C.W., 199 Ill. 2d at 210. Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a circuit court's finding of unfitness only where it is against the manifest weight of the evidence. In re C.N., 196 Ill. 2d at 208. A finding is against

the manifest weight of the evidence where the opposite conclusion is clearly evident. In re C.N., 196 Ill. 2d at 208.

Section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2006)) provides that a parent may be declared unfit if she fails "to make reasonable progress toward the return of the child to the parent within 9 months after the adjudication of neglected or abused minor." Reasonable progress has been defined as " 'demonstrable movement toward the goal of reunification.' " In re C.N., 196 Ill. 2d at 211, quoting In re J.A., 316 Ill. App. 3d 553, 565 (2000). "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later became known and which would prevent the court from returning custody of the child to the parent." In re C.N., 196 Ill. 2d at 216-17.

In the instant case, after the unfitness hearing, the court found that the State met its burden to prove by clear and convincing evidence that respondent failed to make reasonable progress during the initial nine-month period following adjudication, which ran from August 28, 2007, until May 28, 2008. Respondent asserts that although she relapsed by drinking alcohol between August 28, 2007, and May 28, 2008, she immediately enrolled in rehabilitation programs after each relapse, which showed that she was making reasonable progress toward recovery. Respondent further asserts that the fact that she maintained her sobriety for 14 months after her July 23, 2008, relapse is further evidence of her reasonable progress and the trial court's error in finding her unfit to parent Joshua. We disagree.

1-10-1407

A review of the evidence presented at the fitness hearing reveals that, as respondent acknowledges, during the initial nine-month period following adjudication, she relapsed by drinking alcohol several times. In May 2007, five days after successfully completing the SHARE program, respondent was discharged from the LSSI recovery home after drinking a pint of vodka and being taken to the hospital by ambulance. On November 28, 2007, respondent was in an outpatient treatment program called Pro Care when she relapsed by drinking three bottles of wine after which she was again taken to the hospital by ambulance. On February 5, 2008, respondent was in an outpatient program at Gateway when she left, went to a mall, consumed four glasses of wine and returned to Gateway intoxicated. Respondent remained in the Gateway program and was eventually discharged on March 19, 2008. That same date, she went to Safe Haven for further inpatient treatment but was discharged two days later for bringing alcohol on the premises.

In addition to her relapses, respondent's random urine tests were positive for alcohol on August 15, 2007, and September 21, 2007, and she was either unavailable or refused to submit to a urine test on May 8, 2007, November 4, 2007, December 14, 2007, and December 31, 2007, all of which are considered positive results. Respondent's visits with Joshua were also affected by her relapses, as on November 30, 2007, respondent arrived 30 minutes late for a visit with Joshua and was intoxicated when she arrived. On March 27, 2008, respondent tried to visit Joshua while he was visiting with his natural father but was intoxicated and was asked to leave.

Reports from respondent's caseworker, therapists and counselors at the recovery programs she attended also indicate that respondent was not making significant steps toward

-19-

recovery during the initial nine-month period after adjudication. For instance, a progress report from respondent's therapist on December 10, 2007, stated that respondent "superficially addresses issues" and was not "ready to realistically invest in sobriety," and a January 8, 2008, report from Sabrina Rowe at Gateway stated that respondent demonstrated a minimal level of commitment toward recovery. Further, Carla Howard, Joshua's DCFS caseworker, rated respondent's progress unsatisfactory from May 2007 to September 2007 and from September 2007 to March 2008 because did not sustain sobriety or complete recommended services. Ms. Howard also did not permit respondent to have unsupervised visits with Joshua during the initial nine-month period because she had not maintained sobriety long enough to ensure Joshua's safety.

Although it is true, as respondent contends, that she entered rehabilitation programs after her relapses and successfully completed some of them, she engaged in a pattern of recovery followed by relapse. We recognize, as the circuit court did, that relapses are a part of substance abuse recovery. However, the evidence shows that during the initial nine-month period respondent drank alcohol several times while in treatment, tested positive for alcohol, and failed to leave the impression with her therapists, counselors and caseworker that she was committed to remaining sober. In addition, although respondent asserts that she remained sober for 14 months after a July 23, 2008, relapse, this is not relevant to whether the State met its burden to prove by clear and convincing evidence that respondent failed to make reasonable progress from August 28, 2007, until May 28, 2008. Therefore, based on the record we conclude the trial court did not err in finding respondent unfit under section 1(D)(m)(ii) by failing to make reasonable progress

toward Joshua's return within the subject time frame.

Next, respondent contends that the trial court erred in finding that it was in Joshua's best interests that her parental rights be terminated. Once a trial court finds a parent unfit under one of the grounds of section 1(D) of the Adoption Act, the next step in an involuntary termination proceeding requires the court to consider whether it is in the best interests of the child to terminate parental rights, pursuant to the Juvenile Court Act (705 ILCS 405/1-3 (West 2006)). The burden of proof is upon the State, which must prove by a preponderance of the evidence that termination is in the child's best interests. See In re D.T., 212 Ill. 2d 3437, 366 (2004). The court's determination in this respect lies within its sound discretion, especially when it considers the credibility of testimony presented at the best interests hearing; that determination will not be reversed unless it is against the manifest weight of the evidence or the trial court has abused its discretion. See In re G.L., 329 Ill. App. 3d 18, 25 (2002). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." In re Arthur H., 212 Ill. 2d 441, 464 (2004).

Section 1-3(4.05) of the Juvenile Court Act requires a trial court to consider a number of factors for termination within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2006). These include:

"(a) the physical safety and welfare of the child, including food, shelter,

health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel love, attachment and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2006).

Additionally, a court may consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being. In re Jaron Z., 348 Ill. App. 3d 239, 262 (2004). The trial court is

not required to explicitly mention each factor listed in section 1-3(4.05) while rendering its decision. In re Jaron Z., 348 Ill. App. 3d at 262-63. In fact, the court need not articulate any specific rationale for its decision, and a reviewing court need not rely on any basis used by a trial court below in affirming its decision. In re Jaron Z., 348 Ill. App. 3d at 262-63.

Respondent contends that due to Joshua's familial ties and his attachment to respondent the trial court should not have terminated her parental rights because guardianship as opposed to adoption would ensure that Joshua maintained ties with respondent and would foster permanency for him. While familial ties and permanency are factors to be considered in weighing a child's best interests, a review of the evidence in relation to the statutory factors shows that the trial court's decision to terminate respondent's parental rights as to Joshua was not contrary to the manifest weight of the evidence or an abuse of discretion. Evidence presented at the best interests hearing revealed that Joshua was happy in a stable, appropriate, safe home and had bonded with his foster mother, whom he calls "mommy," and her parents, whom he calls "grandma" and "granddaddy." Joshua has also established relationships with foster mother's friends and members of their church community. Joshua has been living with his foster mother for three years, during which time he has attended preschool, participated in after-school activities, become involved in the church community, and joined a soccer team. Joshua participates in individual therapy to cope with issues relating to the separation from his parents and adjusting to his foster home. Joshua's therapist testified that Joshua's foster mother provides structure and proper discipline, and those factors contribute to his feelings of love and security. Joshua's foster mother testified that she wants to adopt him and stated that, if she were permitted

to do so, she would continue to allow Joshua to have contact with his natural parents.

Carla Howard, who has been the family's caseworker since 2007, testified that DCFS recommended termination of respondent's parental rights with a permanency goal of adoption because Joshua is in a preadoptive home with an opportunity for a stable, loving, nurturing home, where he would be consistently provided for. Jenna Merz, the CASA volunteer since 2009 made the same recommendation based on her finding that Joshua's foster mother provides a secure and stable home for him. In addition, the trial court determined that at the time of the best interests hearing respondent was not in a position to have Joshua returned to her. Given that, as respondent acknowledges, she had relapses in December 2009 and February and March 2010, this determination regarding respondent's ability to take care of Joshua was clearly not unfounded. All of this evidence supports the trial court's finding that it was in Joshua's best interests to terminate respondent's parental rights.

Lastly, respondent contends that the trial court erred in terminating her parental rights because Joshua's foster mother testified that she supported continued contact between Joshua and respondent and that guardianship rather than adoption was an acceptable goal. Respondent asserts that this is evidence of strong ties between respondent and Joshua and weighs in favor of not terminating her parental rights because adoption would not ensure continued contact between her and Joshua, which is in his best interests.

First, we note that although Joshua's foster mother initially testified in January 2010 that she would accept a guardianship, she later changed her mind and testified in April 2010 that she wanted to adopt Joshua because his anxiety had increased in the interim, and she thought that

adoption would provide consistency and stability in his life. In addition, while familial ties are a factor that the trial court may consider in making a best interests determination, it is not the sole or necessarily the determinative factor. Further, the fact that Joshua's foster mother testified that she wanted Joshua's family to continue to be involved in his life does not preclude a finding, based on all of the statutory factors, that it was in Joshua's best interests to terminate respondent's parental rights. Therefore, we find that the trial court's order was not contrary to the manifest weight of the evidence or an abuse of discretion.

Affirmed.

NEVILLE and STEELE, JJ., concur.