# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Angela D.*, 2012 IL App (1st) 112887

---

| | |
|---|---|
| Appellate Court Caption | *In re* ANGELA D. and DELILAH A., Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. Marilu M., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-2887 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | March 29, 2012<br><br>May 7, 2012<br>May 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The termination of respondent's parental rights to her daughters was upheld on appeal, notwithstanding her contention that the State failed to prove her unfitness on any of the stated grounds by clear and convincing evidence, since proof of any one of the three grounds alleged would be sufficient, including the allegation that she was addicted to drugs for at least one year prior to the unfitness proceeding, and in respondent's case, during the relevant period, respondent tested positive for PCP on two occasions, she failed to appear for at least four scheduled tests, she was unable to document her attendance at NA-AA meetings, and she prematurely withdrew from inpatient treatment; furthermore, despite the bond between respondent and her children, the termination of her parental rights was in the best interests of the children, especially when the stability and support of the foster family were considered. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 07-JA-345, 07-JA-346; the Hon. Rena Van Tine, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Bruce H. Bornstein, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Tobara S. Richardson, Assistant State's Attorneys, of counsel), for the People. |
| | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain, Jean M. Agathen, and Sarah Donovan, of counsel), guardian *ad litem*. |
| Panel | JUSTICE STERBA delivered the judgment of the court, with opinion. Presiding Justice Lavin and Justice Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1     In a termination of parental rights proceeding beginning on July 26, 2011, the trial court found respondent-appellant Marilu M. to be an unfit mother due to her failure to maintain a reasonable degree of interest, concern or responsibility for her children's welfare (750 ILCS 50/1(D)(b) (West 2010)), her drug addiction (750 ILCS 50/1(D)(k) (West 2010)), and her failure to make reasonable efforts and progress (750 ILCS 50/1(D)(m) (West 2010)). On August 31, 2011, the court terminated Marilu's parental rights as to her daughters, Angela D. and Delilah A. On appeal, Marilu contends that the trial court's finding of unfitness and order terminating her rights was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 2                              BACKGROUND

¶ 3     Marilu M. is the biological mother of Angela D., born on April 20, 2004, and Delilah A., born on August 30, 2006.[1] Although Angela and Delilah are the only children who are the subjects of the present case, Marilu is also the biological mother to five other children, none of whom remain in her custody.

¶ 4     On May 18, 2007, the State filed petitions for adjudication of wardship, alleging that Angela and Delilah, as well as their three older siblings, were neglected and abused. This

_____

    [1]The biological fathers of Angela and Delilah, whose rights were also terminated, are not parties to this appeal.

-2-

charge stemmed from a report to the Illinois Department of Children and Family Services (DCFS) in March 2007 that Marilu's home was in poor condition, lacking food, and littered with trash including dirty diapers and dirty clothes. The report also revealed that Marilu's oldest child had a red mark on his face, but he would not say where it came from. Marilu previously had an intact family case open in 2004, after Angela was born with phencyclidine (PCP) in her system. After a stipulation to the facts was entered, on October 18, 2007, the trial court found both Angela and Delilah abused based on a substantial risk of physical injury, and neglected based on an injurious environment. Angela was also found neglected based on the fact that she was a drug-exposed infant. The girls were adjudicated wards of the court on May 2, 2008.

¶ 5        Subsequently, on September 28, 2010, the State filed a supplemental petition to terminate Marilu's parental rights on the bases that she failed to maintain a reasonable degree of interest, concern, and responsibility as to the girls' welfare (750 ILCS 50/1(D)(b) (West 2008)), she had been a habitual drunkard and/or was addicted to drugs for at least one year prior to the petition (750 ILCS 50/1(D)(k) (West 2008)), and she failed to make reasonable efforts to correct the condition that had resulted in a finding of unfitness and failed to reasonably progress in the goal of having the girls returned to her (750 ILCS 50/1(D)(m) (West 2008)).

¶ 6        At the unfitness hearing on July 26, 2011, the State introduced records from TASC Laboratories and ACCU-Lab Medical Testing revealing the results of Marilu's urine samples. Out of 94 samples taken between September 2007 and March 2011, Marilu tested positive for PCP 9 times.

¶ 7        The State also introduced client services plans (service plans) for April 2008, November 2008, May 2009, and November 2009. With the exception of the service plan of May 2009, all other service plans revealed Marilu had made unsatisfactory progress overall, and specifically as to the goals of remaining available for substance abuse treatment and psychiatric evaluation; participating in parent coaching training; following the conditions of her probation; and attending individual therapy.

¶ 8        A report from the Cook County juvenile court clinic prepared by Dr. Harold Fuentes on April 1, 2010 was also introduced in response to the trial court's request for clinical information. Dr. Fuentes reviewed Marilu's history of inpatient and outpatient drug treatment programs beginning in May 2007 and found a pattern of unsuccessful discharges from these programs. Specifically, in May 2007, Marilu was admitted for outpatient substance abuse treatment at Pilsen-Little Village Community Mental Health Center (Pilsen) as she was found to have significant problems with PCP use. At that point, Marilu denied any problems with drugs, and she was unsuccessfully discharged from the program in October 2007. That same month, she was admitted as an inpatient at Haymarket Center (Haymarket) and professed a commitment to remaining drug free. Her counselor was skeptical of this claim, as she had large amounts of PCP in her system but denied any recent use. On October 31, 2007, she tested positive for pregnancy. By February 2008, Marilu was in intensive outpatient treatment at Haymarket, but in April 2008 she was found to have a minimal commitment to recovery, in light of her inconsistent participation and her absence from five sessions. Moreover, she had tested positive for PCP twice during her third trimester of

-3-

pregnancy in March 2008. One month later, she was in police custody as a result of violating her parole. She was required to attend inpatient substance abuse counseling at Haymarket as part of her probation, which she successfully completed in February 2009. In May 2009, Marilu enrolled in intensive outpatient treatment at Pilsen, but her participation was again inconsistent. Marilu then went back to inpatient treatment for drug addiction at Haymarket in November 2009, after testing positive for PCP in July, September and October of 2009, but was unsatisfactorily discharged one month later. As of January 2010, Marilu was enrolled in intensive outpatient treatment at Haymarket.

¶ 9     With regard to Marilu's parenting, Dr. Fuentes noted Marilu had completed two parenting classes during her inpatient treatment. Additionally, he reviewed 186 visitation logs from October 2007 to December 2009 and found visits occurred regularly between Marilu and Angela, Delilah and their siblings. Marilu was attentive to her children and they were happy to see her. His observation of a two-hour supervised visit between Marilu and her children revealed that Marilu was appropriately attentive, offered spontaneous gestures of affection, and successfully mediated a dispute between her older son and daughter.

¶ 10    Dr. Fuentes also interviewed Eugenio Flamand, a parenting coach for Marilu for over one year. While Flamand had no significant concerns with Marilu's parenting skills, he did express concern that Marilu's PCP abuse and numerous relapses negatively affected her ability to parent. Because of Marilu's repeated relapses, he did not recommend a goal of return home, though he believed terminating parental rights would be too extreme, given that her children needed continued contact with her.

¶ 11    Ultimately, Dr. Fuentes concluded Marilu would be unable to achieve the goal of reunification with her children due to her inability to refrain from using PCP for any length of time and her poor and inconsistent participation in treatment. He noted that terminating parental rights would help all of Marilu's children achieve closure and predictability, but stressed the importance of finding foster parents who would be amenable to allowing continued contact with Marilu.

¶ 12    The only witness to testify at the unfitness hearing was Beatriz Ramirez, the case manager for Angela and Delilah since February 5, 2009. When Ramirez assessed Marilu in May 2009, she rated Marilu's participation in the 12-step program as unsatisfactory, because Marilu was unable to provide proof of attendance. Ramirez recommended Marilu participate in outpatient substance abuse treatment, as Marilu had self-disclosed using PCP the prior month. At Marilu's next evaluation in November 2009, Ramirez testified Marilu had made unsatisfactory progress in outpatient substance abuse treatment, given that she had tested positive for PCP in July, September and October of 2009. Furthermore, Ramirez again noted that Marilu could not produce confirmation of her attendance at Narcotics Anonymous-Alcoholics Anonymous (NA-AA) meetings, though she stated she had attended.

¶ 13    Due to Marilu's relapse, Ramirez referred her to an inpatient substance abuse program at Haymarket, which Marilu began in November 2009. However, Marilu left the inpatient program in December 2009, only 30 days into the 90-day program. Ramirez stated Marilu informed her she was not learning anything new from the program and felt she could successfully maintain sobriety on her own. Marilu did perform better in intensive outpatient

therapy from January 2010 to April 2010, though she still had unsatisfactory participation in NA-AA meetings. Moreover, as part of her recovery, Marilu was supposed to self-disclose any relapse into drug use, but she continued to deny using PCP even after a positive test in March 2010.

¶ 14    Also as part of her recovery, Ramirez asked Marilu to submit to drug tests two to three times a month. Ramirez testified Marilu failed to appear for tests on six occasions in 2010 and four occasions in 2011. While Marilu gave various reasons for the failure to appear, including ill health, attending court, forgetfulness, other appointments, and having family over, Ramirez testified that several of these excuses lacked corroboration, and as such, the no-shows were treated as positive drug test results.

¶ 15    Ramirez also testified as to Marilu's parenting skills, stating that she showed a reasonable degree of interest and concern for Angela and Delilah, but never progressed to the point where she could have unsupervised visitation with either child.

¶ 16    After the State rested, the guardian *ad litem* offered into evidence six family counseling reports dating from September 2009 to February 2011, prepared by Eugenio Flamand. The reports all revealed that Marilu had good communication with her children and engaged in age-appropriate interaction, but she was unable to overcome her chronic substance abuse issues. Specifically, the report of April 2010 described Marilu had a "chronic history of substance relapse" over the past three years and recommended Marilu abstain from drug use for one year before unsupervised visits could be considered.

¶ 17    Marilu submitted a progress report from Northwestern Counseling Services dated September 1, 2009, where it was revealed that Marilu had symptoms of mild to moderate depression after losing custody of her youngest son in July 2009.

¶ 18    After hearing closing arguments, the court found Marilu unfit on all grounds alleged by the State as to Angela and Delilah. The court acknowledged Marilu cared deeply for her children, as evidenced by her regular visits and her court appearances. The court also recognized Marilu's "multiple attempts" to stop using PCP, but noted that in spite of these attempts she relapsed multiple times and "could not control her cravings." The court cited as evidence the excuses Marilu gave for failing to appear for tests, her denial of PCP use in the face of positive tests, and the positive tests themselves. Due to Marilu's lack of progress in refraining from using PCP, the court noted she never achieved unsupervised day visits. Ultimately, the court found "despite her demonstrated caring and efforts, this is, by no stretch of the imagination, reasonable progress" and entered a finding of unfitness.

¶ 19    The best-interests portion of the termination proceedings began on July 28, 2011. Beatriz Ramirez again testified for the State. She testified that Angela and Delilah have been placed with foster parents Mr. and Mrs. R. since June 18, 2009. In addition to Angela and Delilah, the foster parents have another son and daughter. On Ramirez's monthly visits to the home, she found that Angela and Delilah receive the same treatment as the foster parents' other children and are happy in their placement. They both call their foster parents "mommy" and "poppy," and refer to the other children as brother and sister. Additionally, they interact with the R.'s extended family and refer to Mrs. R.'s mother as "abuelita," which is Spanish for "grandmother." The girls are integrated into the R.'s community, meeting with neighbors and

long-time friends for get-togethers and celebrations. When Ramirez discussed adoption with Angela and Delilah in July 2011, both girls told Ramirez they felt safe and loved with their foster family and did not want to go anywhere else. Delilah stated she feels her home is with her foster family. Angela also showed Ramirez a drawing depicting her family as Mr. and Mrs. R., their children, and Delilah.

¶ 20    On cross-examination, Ramirez testified she did not inform Angela and Delilah that an adoption by Mr. and Mrs. R. would mean they may never see Marilu again. Ramirez explained that the foster parents have made an effort to keep Marilu in the girls' lives and would support their continued contact with Marilu and the biological siblings. She further testified that Mr. and Mrs. R. have allowed their other adopted child continued contact with its biological family.

¶ 21    Ramirez testified Angela and Delilah still refer to Marilu as "mom" and refer to Marilu's mother as "grandmother." The interaction between the girls and Marilu is always loving and appropriate. Furthermore, Ramirez testified Marilu is still engaged in counseling and has had no positive drug tests since November 2010. In her opinion, it was in the best interests of Angela and Delilah to have parental rights terminated but remain in contact with Marilu.

¶ 22    The guardian *ad litem* called Gloria Cockerill, a licensed clinical social worker and Angela's play therapist since April 2010, as a witness. Cockerill testified Angela had reactive attachment disorder stemming from seven placement changes. This disorder manifests itself with aggressive behavior and over-familiarity with strangers. Angela's prognosis was good since she was in a stable placement with her foster family. Cockerill testified Angela felt safe in her foster parents' home and referred to Mr. and Mrs. R. as "poppy" and "mommy." Angela also referred to Marilu as "mommy." Ultimately, Cockerill concluded it was in the best interests of Angela to be in a stable, safe home while maintaining a connection with her biological family. She explained that if Angela could no longer see Marilu or her biological siblings it would be traumatic for her.

¶ 23    Marilu introduced a report by Fernando Cisneros, a licensed clinical social worker with I Am Able Center for Family Development, dated July 11, 2011. In his report, Cisneros stated Marilu told him she was abstinent from drugs during the time of their therapy, which began in April 2011. However, Marilu was unable to provide proof of attendance at NA meetings, though she claimed she had attended. Marilu reported she no longer associates with peers who use drugs and is developing new friendships. Cisneros noted Marilu is more aware that the path to recovery requires drastic lifestyle changes. Marilu also enjoyed her supervised visits with her children and stated she is most closely bonded to her youngest son.

¶ 24    After hearing closing arguments, the court ruled it was in Angela and Delilah's best interests to terminate parental rights. The court explained:

> "[T]he children, I do understand that they have attachments to their mom, but they also have very strong attachments to the foster parents as well, and they are, the foster parents, are the ones who are in the best position to contribute more to the children's sense of security, their sense of familiarity, and because they are around and can provide for them the best, they are in the best position to demonstrate the continuity of affection for both children."

¶ 25 The court also referenced the ties the girls had developed within their foster parents' community, the need for permanency, and the importance of finding a placement where their sibling relationship could develop. Accordingly, the court terminated the parental rights of Marilu and appointed a guardian with the right to consent to the adoption of Angela and Delilah.

¶ 26 Marilu timely filed this appeal.

¶ 27                                    ANALYSIS

¶ 28 Marilu contends the State filed to prove unfitness on any of the grounds stated by clear and convincing evidence.[2] See *In re R.C.*, 195 Ill. 2d 291, 301 (2001); 750 ILCS 50/8(a)(1) (West 2010). Under the Juvenile Court Act of 1987 (Act), the unfitness hearing is the first step in an involuntary termination of parental rights proceeding. 705 ILCS 405/2-29(2) (West 2010); see also *In re M.A.*, 325 Ill. App. 3d 387, 390 (2001). A trial court's finding of unfitness will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the lower court's determination is "unreasonable, arbitrary, or not based on [the] evidence presented." *In re J.Y.*, 2011 IL App (3d) 100727, ¶ 21.

¶ 29 In the instant case, though the State alleged three grounds of unfitness, proof of any one ground is sufficient to find a parent unfit. *In re Antwan L.*, 368 Ill. App. 3d 1119, 1123 (2006); see also 750 ILCS 50/1(D) (West 2010). Because we find that the State met its burden to prove unfitness under section 1(D)(k) of the Act, which alleges unfitness based on the parent's habitual drunkenness or addiction to drugs for at least one year prior to the unfitness proceeding (750 ILCS 50/1(D)(k) (West 2010)), we need not consider whether Marilu was also unfit for failing to exhibit a reasonable degree of interest, concern or responsibility for her children (750 ILCS 50/1(D)(b) (West 2010)), or failing to make reasonable efforts and progress (750 ILCS 50/1(D)(m) (West 2010)). See *In re Precious W.*, 333 Ill. App. 3d 893, 900 (2002).

¶ 30 Marilu maintains her positive tests for PCP are insufficient evidence of addiction. "Addiction to drugs" under section 1(D)(k) of the Act has been interpreted to mean "the inability or unwillingness to refrain from the use of drugs because frequent indulgence has instilled in the person an habitual craving which is manifested in an ongoing pattern of drug use." *In re D.M.*, 298 Ill. App. 3d 574, 580 (1998). It is not necessary for the State to prove evidence of "indulgence without intermission." *Id.* Rather, a finding of unfitness may be supported by a demonstrated inability to control a habitual craving to use the drug. *Id.*

¶ 31 In the instant case, the parties agree the relevant one-year period to assess Marilu's drug use began on September 28, 2009, and ended on September 28, 2010, when the State filed the supplemental petition to terminate rights. See *In re Latifah P.*, 315 Ill. App. 3d 1122,

_____

[2]Although Marilu raises this as her second argument, we consider it first as it is the initial step in the bifurcated procedure prescribed by the Juvenile Court Act of 1987 to determine whether a parent's rights should be terminated. 705 ILCS 405/2-29(2) (West 2010).

1129-30 (2000) (unfitness proceedings commence when the State files its supplemental petition for termination of parental rights). During that one-year period, Marilu tested positive for PCP on October 6, 2009, and March 30, 2010. Two positive tests have been held sufficient to support a finding of drug addiction. *In re Precious W.*, 333 Ill. App. 3d at 899-900 (where respondent's urine tested positive for cocaine twice in the relevant one-year period, this evidence alone clearly and convincingly showed her inability to control her craving for the drug).

¶ 32     Here, Marilu's ongoing pattern of drug use is supported by even stronger facts. In addition to the two positive tests, Marilu failed to appear for at least four scheduled tests during the one-year period at issue. While Ramirez accepted Marilu's excuse for failing to appear at the test on March 27, 2010, as Marilu had indicated she could not find the testing location, Ramirez testified there was no corroboration for the reasons behind the remaining no-shows. For example, in June 2010, Marilu stated she forgot, and in August 2010, Marilu said her family was over and she was unable to reach the testing location on time. Ramirez testified that these uncorroborated excuses for no-shows are treated as positive test results.

¶ 33     While Marilu argues any positive results can be explained by the fact that relapse is a part of recovery, the evidence called into question her meaningful participation in the recovery process. Specifically, as part of her recommendations for recovery, Marilu was instructed to self-disclose PCP use. However, prior to her positive test of March 30, Marilu had not only failed to disclose her use, but continued to deny her use in the face of this positive test. Furthermore, Ramirez testified Marilu was never able to provide documentation for her attendance at NA-AA meetings, another important aspect of recovery. Finally, Marilu prematurely withdrew from inpatient treatment at Haymarket only to test positive for PCP less than four months later.

¶ 34     Taken together, the evidence supports the trial court's finding of unfitness on the ground of addiction to drugs. The positive test results, when Marilu knew she would be subject to random drug tests, coupled with Marilu's failure to engage in the recommended recovery treatments, revealed both an inability and unwillingness to control her craving for drugs. As a result, we cannot find that the trial court's determination of unfitness was against the manifest weight of the evidence.

¶ 35     We turn next to Marilu's contention that the State failed to prove it was in the best interests of her children to terminate parental rights. Once a finding of unfitness has been made, the next step in a termination proceeding is to determine whether it is in the best interests of the child to terminate parental rights. *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002). During the best-interests phase, the parent's rights must yield to the child's best interests. *Id*. It is the State's burden to prove by a preponderance of the evidence that termination is in the child's best interests. *In re D.T.*, 212 Ill. 2d 347, 366-67 (2004). Again, the trial court's determination will not be reversed unless it is against the manifest weight of the evidence. *In re Deandre D.*, 405 Ill. App. 3d at 953.

¶ 36     In making a determination as to a child's best interests, the court is required to consider the following factors:

"(a) the physical safety and welfare of the child, including food, shelter, health, and

clothing;

 (b) the development of the child's identity;

 (c) the child's background and ties, including familial, cultural and religious;

 (d) the child's sense of attachments, including:

  (i) where the child actually feels love, attachment, and a sense of being valued ***;

  (ii) the child's sense of security;

  (iii) the child's sense of familiarity;

  (iv) continuity of affection for the child;

  (v) the least disruptive placement alternative for the child;

 (e) the child's wishes and long-term goals;

 (f) the child's community ties, including church, school and friends;

 (g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

 (h) the uniqueness of every family and child; [and]
 ***

 (j) the preferences of the person available to care for the child." 705 ILCS 405/1-3(4.05) (West 2010).

See also *In re S.D.*, 2011 IL App (3d) 110184, ¶ 34. Marilu argues that because Angela and Delilah are bonded to her and may suffer trauma if contact is severed, it was not in their best interests to terminate her rights. We disagree.

¶ 37 It is true that all of the witnesses who evaluated the parent-child relationship, including Beatriz Ramirez, the case manager, Gloria Cockerill, Angela's play therapist, and Eugenio Flamand, the parenting coach, all testified that Angela and Delilah have a good relationship with Marilu. Specifically, Ramirez and Cockerill noted that the girls call Marilu "mommy" and are always happy to see her. However, Ramirez and Cockerill also testified that Angela and Delilah are attached to Mr. and Mrs. R., their foster parents of two years, as well. Ramirez testified that Angela and Delilah refer to their foster parents as "mommy" and "poppy." Both girls feel safe and loved with their foster parents and consider them family. More significantly, Angela and Delilah told Ramirez in July 2011 that they did not want to leave their foster family and considered it their home. In light of this testimony, it was not against the manifest weight of the evidence for the court to find that it was in the best interests of Angela and Delilah to privilege their bond with Mr. and Mrs. R. over that with Marilu, given that Mr. and Mrs. R. were in the best position to maintain and nurture the bond. See, *e.g.*, *In re Julian K.*, 2012 IL App (1st) 112841, ¶¶ 82-83.

¶ 38 Specifically, the foster parents had demonstrated a commitment to meeting the needs of Angela and Delilah over the preceding two years; for example, they advocated for Angela to receive necessary therapy. Both Mr. and Mrs. R. also integrated the girls into their community and their extended family. In contrast, despite over five years of services, Marilu had never progressed beyond supervised visitation with the girls. Moreover, Marilu's lack

of positive drug tests after November 2010 is misleading evidence of sobriety, given that Marilu missed four tests in 2011 with various excuses, some of which were uncorroborated.

¶ 39 The cases Marilu cites in support of her contention that her bond with her children mandates a finding that her rights were terminated in error are inapposite, as each case addresses factors apart from the strength of the bond in ruling against termination. For instance, in *In re B.C.*, 247 Ill. App. 3d 803, 807 (1993), along with referencing the bond between the respondent and the minor children, this court cited the DCFS worker's testimony that adoption was not in the minors' best interests as a basis for reversing the lower court's termination of rights. Likewise, in *In re M.F.*, 326 Ill. App. 3d 1110, 1118 (2002), and *In re D.T.*, 338 Ill. App. 3d 133 (2003), *aff'd in part & rev'd in part*, 212 Ill. 2d 347 (2004), we found the strength of the bond between the minor children and the respondents weighed against termination where there was no evidence that any benefit or increased stability would inure to the children upon termination. In contrast, here, Angela and Delilah's case manager for over two years testified it was in their best interests to have Marilu's rights terminated. Additionally, termination would result in increased stability and security for Angela and Delilah, given that they would be in a position for adoption by their foster parents. As such, the bond between the girls and Marilu, standing alone, does not compel a conclusion that termination was against the manifest weight of the evidence.

¶ 40 Nor does Cockerill's testimony that it would be traumatic for Angela if contact with Marilu and her biological siblings were to cease necessarily change this result. Importantly, Cockerill also testified that Angela needed a stable and nurturing environment in order to best manage her reactive attachment disorder. No witness disputed that the foster parents provided such an environment for Angela while Marilu did not. Even Flamand, the parenting coach who, in 2010, opined that termination of parental rights was too extreme a step, stated that Marilu could not provide long-term care to her children. Because the fundamental purpose behind the Act is to secure permanency for minors as early as possible (705 ILCS 405/1-2(1) (West 2010)), it was not error for the court to determine that any potential trauma Angela may face if contact with Marilu was discontinued was outweighed by the stability and support she would unquestionably receive with her foster family.

¶ 41 This is particularly true where there was evidence that contact between Marilu and Angela and Delilah and their biological siblings would not cease if adoption occurred. The trial court acknowledged that once rights are terminated, there is no guarantee of future contact with the biological family; however, the evidence in the case *sub judice* suggested the foster parents are committed to acting in the best interests of Angela and Delilah and would allow them to have continued contact with Marilu. Indeed, the foster parents have allowed their other adopted child to maintain a relationship with its biological family. Contrary to Marilu's contention, such evidence is relevant when making a determination as to the best interests of the child. See *In re Joshua K.*, 405 Ill. App. 3d 569, 584, 947 N.E.2d 280, 293 (2010) (noting that potential adoptive parent would allow contact with biological family in affirming trial court's termination of parental rights); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 83.

¶ 42 Accordingly, we hold that the trial court's decision to terminate Marilu's parental rights was not against the manifest weight of the evidence.

¶ 43                                    CONCLUSION

¶ 44      For the reasons stated, we affirm the trial court's finding of unfitness and termination of parental rights.

¶ 45      Affirmed.