2019 IL App (1st) 190856-U
No. 1-19-0856

SECOND DIVISION
December 24, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| IN THE INTEREST OF B.T., | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Minor-Respondent-Appellee, | ) ) | |
| (THE PEOPLE OF THE STATE OF ILLINOIS) | ) ) | No. 14JA1297 |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | The Honorable |
| ANGELICA T., | ) ) | John Huff, Judge Presiding. |
| Mother-Respondent-Appellant. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:*    Circuit court's finding that mother was an unfit parent affirmed where the admission of any improper evidence did not prejudice the respondent; circuit court's finding that it was in the best interest of the minor child to terminate her biological mother's parental rights affirmed where the relevant statutory best interest factors supported the court's conclusion.

¶ 2    Following hearings conducted in accordance with the Juvenile Court Act of 1987 (Juvenile

Court Act) (705 ILCS 405/1-1 *et seq*. (West 2014)), the circuit court found that respondent,

Angelica T., was an unfit parent as that term is defined in section 1(D) of the Illinois Adoption Act (Adoption Act) (750 ILCS 50/1 (D) (West 2014)), and that it was in the best interest of her minor child B.T. to terminate her parental rights. On appeal, Angelica challenges the propriety of the circuit court's orders finding her to be an unfit parent and terminating her parental rights. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 3                                         BACKGROUND

¶ 4      Angelica T. is the biological mother of B.T., born August 17, 2014. The identity of B.T.'s biological father is unknown. At the time of B.T.'s birth, Angelica was 18-years old. Angelica possesses an IQ of 62 and her adaptive functioning has been assessed to be that of a 10-year-old child. She has never graduated high school, maintained employment, or lived independently. Due to concerns about Angelica's cognitive and developmental delays, the State filed a petition for adjudication of wardship and a motion for temporary custody on B.T.'s behalf. In the October 14, 2014, filings, the State alleged that B.T. was an abused, neglected, and dependent minor because she was residing in an environment that was injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2014)), was at substantial risk for physical injury (705 ILCS 405/2-3(2)(ii) (West 2014)), and was without proper care due to her mother's physical or mental disabilities (705 ILCS 405/2-4(1)(b) (West 2014)). In support of its claims of abuse, neglect, and dependency the State alleged as follows:

> "Mother resides with a family member who has an indicated report for sexual penetration. Mother has cognitive and developmental delays. Mother has been diagnosed with developmental disability with a history of psychosis. Mother has previously been psychiatrically hospitalized and has suffered from auditory hallucinations. At the time of this minor's birth medical personnel were concerned with

mother's ability to parent. Minor was jaundice at birth and mother initially refused to consent for minor to receive treatment. Per hospital personnel mother did not understand important aspects of how to care for this minor such as minor's feeding schedule. Putative father's identity and whereabouts are unknown. Paternity has not been established."

¶ 5     The circuit court granted the State's petition for temporary custody and placed B.T. in the custody of the Illinois Department of Child and Family Services (DCFS or Department). The cause then proceeded to an adjudication hearing and at the conclusion of that hearing, the circuit court entered an order finding that B.T. was a neglected minor because she had been residing in an environment injurious to her welfare. The adjudication order also found that B.T. was a dependent minor because she was denied proper care due to the disability of her parent. At the disposition hearing that followed, the court found that Angelica was "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline" B.T. and entered an order placing B.T. in the guardianship of a DCFS Administrator, who in turn, was afforded the right to place B.T. in foster care. When she was approximately 10-months old, B.T. was placed in the foster home of Tracy H. The permanency order initially entered by the circuit court set a goal of returning B.T. to Angelica's care within 12 months because Angelica was "in need of services."

¶ 6     On September 14, 2017, the State filed a Supplemental Petition for the Appointment of a Guardian with the Right to Consent to Adoption seeking the termination of Angelica's parental rights. In support, the State alleged that Angelica was an "unfit" parent as that term is defined in the Adoption Act because she:

"[F]ailed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare, in violation of 750 ILCS 50/1 D(b) and 705 ILCS 405/2-29. ***

[F]ailed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from [her] and/or h[as] failed to make reasonable progress toward the return of the child to them within 9 months after the adjudication of neglect or abuse under the Juvenile Court Act, or after an adjudication of dependency under the Juvenile Court Act, and/or within any 9 month period after said finding, in violation of 750 ILCS 50/1 D(m) and 705 ILCS 405/2-29. * * *

[I]s unable to discharge parental responsibilities because of mental impairment, illness, or retardation as defined in 405 ILCS 5/1-116, and/or is developmentally disabled as defined in 405 ILCS 5/1-106, and there is sufficient justification to believe that such inability to discharge parental responsibilities shall extend beyond a reasonable time, in violation of 750 ILCS 50/1 D(p) and 705 ILCS 405/2-29."

¶ 7 The State further alleged that it was in B.T.'s best interest "that a guardian be appointed with the right to consent to her adoption based upon the following facts:

a. The minor has resided with her foster parent(s) since July 6, 2015.

b. The foster parent(s) desire(s) to adopt the minor.

c. Adoption by the minor's foster parent(s) is in the best interest of the minor."

¶ 8 Once the pleadings had been filed, the circuit court presided over a fitness hearing, the first phase of any bifurcated termination of parental rights proceeding.

¶ 9                                     Fitness Hearing

¶ 10 At the hearing, Rob Siegel, an expert in the field of clinical psychology and a consulting psychologist with the Juvenile Protection Agency (JPA), testified that he completed a permanency planning assessment for B.T. after meeting with members of her biological family, her foster family, observing a parent-child visit between B.T. and Angelica, and reviewing an "extensive"

number of relevant documents. During the parent-child visitation at Angelica's home, a home that she shared with her parents and one of her brothers, Siegel observed B.T., who was 2 ½ years old at the time, engage in a number of "problematic" behaviors while in the presence of her mother, including throwing toys, spitting, biting, standing on a table, and refusing to pick up toys. Angelica did display some "nurturing" behavior and did attempt to provide B.T. with an appropriate snack during the visit; however, Siegel opined that the 7 slices of cheese and an apple that Angelica gave to her daughter was "excessive" and inappropriate for a child B.T.'s age. Angelica's mother, Evelyn R., was also present during the visit and Siegel was "really concerned with the dynamics between mom and grandmother." He noted that "mom and grandmother were both referred to as mom and sometimes it felt like grandmother was trying to parent mom and granddaughter." In addition, Siegel felt that some of Evelyn's "reactions and attempts to intervene were undermining," and resulted in Angelica becoming "more permissive and more passive in her parenting role." He also found some of Evelyn's "silliness" to be problematic. He noted that she laughed when B.T. engaged in biting behavior and that she pretended to bite B.T. back in response. Evelyn also made a joke that B.T. was sexualizing a doll when the manner in which B.T. touched the doll was "normative [play] behavior" for a two-and-a-half-year-old child. He found Evelyn's joke especially troubling because the family had an "intergenerational history of sexual abuse."

¶ 11    During the visit, neither Angelica nor Evelyn encouraged B.T. to communicate verbally and as a result, "most of B.T.'s communication came through sound effects and grunts and noises." He found the maternal family's failure to encourage B.T.'s verbal communication skills to be particularly problematic because B.T. was at an important stage of language development and was receiving speech services. Moreover, neither Angelica nor Evelyn appeared to encourage B.T.'s

potty training. Siegel noted that B.T. wore a diaper during the visit and that when she gestured toward the bathroom, Evelyn simply told her, "you're wearing a diaper."

¶ 12    Siegel testified that he also observed B.T. in the presence of her foster family and that he found a marked difference in B.T.'s behavior when he observed her in her foster home. While at her foster home, B.T. did not engage in any of the troubling behavior that he observed when she was in the presence of her mother and grandmother. That is, he did not observe B.T. spit, bite, or throw toys; rather, she was responsive and willingly followed the directives of her foster mother, Tracy H. Moreover, Siegel observed that B.T.'s foster family encouraged B.T.'s verbal communication skills and as a result, she was able to communicate by "stringing multiple words together." B.T.'s foster family also encouraged her potty training. When Siegel observed B.T. in her foster home, she was not wearing a diaper and appeared to be fully potty trained.

¶ 13    Ultimately, based on his observations, interviews, and review of pertinent documents, Siegel recommended that B.T. "remain in her foster home" and that DCFS should "work towards [her] adoption." Siegel explained that his recommendation was based in part on his "concerns about [Angelica's] ability to parent independently." He explained that Angelica appeared to be "easily influenced" by people around her and was quick to abandon her parenting instincts based on the behavior of others. Angelica also demonstrated "questionable judgments" when it came to parenting her daughter, "especially when it came to nutrition." Siegel and his team also "had concerns about [Angelica's] ability to follow through with limits and structure and her ability to make decisions" for her daughter. More importantly, he did not believe that Angelica could realistically gain the skills and support that she needed to be able to successfully parent B.T. in a reasonable time in the presence of her current support system. Siegel opined that Angelica's current support system "actually limited her ability to parent even further." He explained that

Angelica's mother, in particular, often contradicted and undermined the parental instincts that Angelica possessed, and based on his understanding, Angelica did not have any other sources of support other than her immediate family. He noted that Angelica's father, Andres T., was also present in the home during the visit that he observed; however, he did not take part in the visitation or in any interviews. Siegel completed a written report documenting his findings about Angelica's parenting limitations and his recommendation that B.T. remain in her foster home, which was admitted into evidence.

¶ 14     On cross-examination, Siegel acknowledged that the visit that he observed between Angelica and B.T. occurred in the afternoon. At that time, Angelica was permitted "frequent" visits with B.T. She saw her daughter approximately three to four days per week for two hours each time. Those visits, however, were typically scheduled during morning hours. Angelica, however, confirmed to him that that B.T.'s behavior during the afternoon visit that Siegel observed was consistent with the behavior that B.T. displayed during regularly scheduled morning visits.

¶ 15     Dr. Sweety Agrawal, a clinical psychologist for the Cook County Juvenile Court Clinic and an expert in the field of clinical psychology, testified that she was called upon to complete a "Ground P" evaluation for Angelica and to assess how Angelica's disabilities affected her ability to discharge her parenting responsibilities. To complete the evaluation, Dr. Agrawal met with Angelica on three occasions, spoke to Angelica's mother, and observed an hour-long parent-child visitation session. She also met with DCFS caseworker Moises Jimenez, and John Bedla, Angelica's parenting coach. In addition, Dr. Agrawal reviewed a number of documents, including the DCFS case file, parenting assessments, and documents completed by other service providers.

¶ 16     Dr. Agrawal testified that the parent-child visit that she observed occurred at a public library. Angelica's mother and brother accompanied her to the visit and the foster mother's brother

was also present. During the visit, Dr. Agrawal saw Angelica and B.T. "playing and interacting," but noted that Angelica's efforts to engage with B.T. were not always successful. Moreover, there were occasions when Angelica failed to engage with her daughter and chose to converse with her mother and brother instead. Dr. Agrawal found it concerning that the foster mother's brother had to intervene on several occasions during the visit to ensure that B.T. did what was asked of her and engaged in appropriate behavior. For example, he asked B.T. to stop rocking in her chair when she was doing so in a manner that was faster than appropriate. He also escorted her to the restroom when Angelica failed to do so despite asking her daughter on several occasions if she needed to go to the bathroom.

¶ 17 Based on her interactions with Angelica and her review of relevant records, Dr. Agrawal diagnosed Angelica with "intellectual disability mild," a diagnosis demarcated by an IQ score that is at least two deviations below the mean and is accompanied by deficits in adaptive functioning. She opined that Angelica's disability prevented her from properly discharging her parenting responsibilities. Dr. Agrawal explained that Angelica's deficits impede her ability to learn parenting skills and from exercising proper judgment to problem-solve and make important parenting decisions. Moreover, Angelica lacks insight into her disability which precludes her from obtaining the assistance required in order to properly care for her daughter. As an example of Angelica's inability to exercise proper judgment, Dr. Agrawal noted that B.T. suffered a burn while in her mother's care and that Angelica did not report the burn to DCFS or obtain medical care for her daughter. Instead, Angelica relied on the unsound advice of a family member and failed to obtain treatment for B.T. Dr. Agrawal noted that Angelica continues to display a lack of understanding as to how to properly care for B.T. should she suffer from a fever or illness in the future.

¶ 18    Dr. Agrawal opined that Angelica's difficulty in learning parenting skills was especially problematic because B.T.'s development was progressing more quickly than Angelica's ability to learn and apply the skills necessary to match B.T.'s needs. Those needs will only continue to evolve as B.T. ages. Dr. Agrawal classified Angelica's intellectual disability as "static," explaining that it is "unchanging" and would not improve with time. As a result, Angelica's ability to discharge her parenting responsibilities would likewise not improve with time. Given the static nature of Angelica's intellectual disability, Dr. Agrawal did not believe that she would ever be able to safely parent B.T. on her own. In her opinion, no amount of support or parenting classes would permit Angelica to ever parent B.T. safely on her own. She explained that even though Angelica has displayed an ability to mimic parenting behaviors taught to her by parenting coaches, she lacks the ability to independently exercise proper judgment and make the instant decisions that are necessary to safely raise a child. Dr. Agrawal completed a written report detailing her findings and recommendations, which was entered into evidence.

¶ 19    Moises Jimenez, a child welfare specialist with DCFS, was assigned to B.T.'s case in November 2014. At the time that B.T. was brought to the Department's attention, an integrative assessment for Angelica was also completed. The assessor found that Angelica was in need of a variety of services, including individual therapy, parent training, and domestic violence services. Angelica did attend some individual therapy sessions; however, she did not successfully complete therapy. Likewise, she did receive parent coaching, but did not successfully complete the program. Angelica also failed to complete the recommended domestic violence services.

¶ 20    At the time of the fitness hearing, Angelica was permitted visits with B.T. twice per month, which was a decrease in the amount of visitation that she was initially afforded. Jimenez explained that Angelica was initially permitted daily supervised visitation with her daughter; however, her

visitation sessions were reduced when B.T. was returned to her foster home with a third-degree burn for which Angelica never sought medical attention. At the time that B.T. sustained the burn, Angelica's father, who was supposed to have been supervising the visitation session, had gone into the backyard and had left B.T. in the house with Angelica.

¶ 21    Jimenez testified that Angelica has attended "most" of her scheduled visits with her daughter; however, there have been two occasions where she failed to appear for a visit and failed to notify anybody that she was not going to be present. There was also a two-month period of time where Angelica "reportedly moved to Wisconsin" to live with a man with whom she had a romantic relationship. Jimenez did not find out about the move until the parties were engaged in mediation. Before her move to Wisconsin, the man had been living with Angelica at the home she shared with her family; however, Angelica failed to notify DCFS that he was living at the residence and DCFS was not afforded an opportunity to investigate him. Angelica has since returned to her parents' house. Angelica and Evelyn, however, have both told Jimenez that they are planning on moving out of the family residence because Angelica's father has issues with drinking and aggression.

¶ 22    Throughout the years that he has been assigned to B.T.'s case, Jimenez has observed a number of parent-child visits. During those visits, B.T. has engaged in "minimal interaction" with her mother. Instead, she generally prefers to engage with him. Jimenez testified that he did "not really" have any concerns about Angelica's behavior during her visits with her daughter. In his opinion, however, it was important for the visits to remain supervised.

¶ 23    DCFS caseworker Chanel Robinson testified that she was assigned to observe a visitation session between Angelica and B.T. that occurred on July 30, 2018. On that occasion, she transported B.T. to and from the visit with her mother. Angelica's mother, Evelyn, and one of her

brother's were also present during the visit. Based on her observations, Robinson testified that there "did not appear to be a bond between B.T. and her mom." She explained that B.T. was generally "nonresponsive" when Angelica attempted to communicate with her; however, B.T. did appear to be "a little more attached to her grandmother than her mom" and was "a little bit more receptive" when Evelyn interacted with her. Robinson noted that when the visit began, B.T. expressly declined to hug Angelica. She did, however, greet and hug Evelyn as if she had missed her. During the visit, Robinson observed Angelica attempt to engage in appropriate parenting behavior. For example, she provided her daughter a snack; however, Robinson opined that the 5 bananas and several yogurts that Angelica gave to B.T. in a 20-minute period of time was excessive and an inappropriate amount for a child B.T.'s age. Moreover, although Angelica did escort her daughter to the bathroom during the visit, she only did so after Evelyn prompted her. As a whole, it appeared to Robinson that Angelica's mother took on a heavier parenting role with respect to B.T. than Angelica did during the supervised visit. Angelica's parenting role appeared more of a "secondary role."

¶ 24    Tracy H. testified that she has been B.T.'s foster parent since July 6, 2015, and that B.T. has resided with her in the home that she shares with her mother, father, and 11-year old biological daughter. Currently, Angelica is permitted two monthly supervised visitation sessions with her daughter and Tracy schedules those visits with Evelyn. Those hour-long visits occur at the Bensenville Public Library and Tracy generally supervises those visits. She testified that Angelica has missed four or five scheduled visits over the past year. On two of those occasions, Angelica did not inform her ahead of time that she would not be present for the scheduled visit and Tracy brought B.T. to the library and waited until it became apparent that Angelica was not going to appear. When asked about the visits she has supervised, Tracy testified that B.T. and Angelica

"usually have some really good interaction" for the first 20 to 30 minutes of the visit; however, they do not appear to be "bonded" to each other and engage in "minimal" communication with each other during the remainder of the visit. Instead of playing with each other, Angelica and B.T. usually engage in "parallel play" where each of them plays with toys next to each other, but not with the other. Tracy has observed occasions where Angelica has employed parenting skills during the visits when prompted to do so. For example, there have been some occasions where Angelica has attempted to "redirect" B.T. when B.T. engages in inappropriate behavior during the visits. Tracy testified that she never observed any safety issues during the visits. In the event that Angelica was adjudicated an unfit parent, Tracy expressed a willingness to continue to facilitate contact between B.T. and her biological family.

¶ 25    After presenting the aforementioned testimonial evidence, the State admitted a number of documents into evidence, including various reports as well as psychological evaluations completed for Angelica and her mother, Evelyn. In Evelyn's evaluation, the reviewer concluded that she lacked the intellectual and cognitive functioning to display adequate judgment, problem solving, and reasoning abilities. The reviewer categorized Evelyn's ability to regulate her emotions as "weak" and found that she "tends to isolate" herself. Moreover, she appeared to be overly dependent on her ex-husband, with whom she continued to reside.

¶ 26    Dr. Darlene Perry, a licensed clinical psychologist and an expert in the field of clinical psychology, testified on behalf of Angelica. She explained that she was retained by the Illinois Public Defender's office and tasked with completing a parenting capacity evaluation for Angelica to determine the impact that Angelica's developmental delays have on her ability to parent. As part of that process, Dr. Perry conducted several clinical interviews with Angelica and Evelyn, observed two visitation sessions between Angelica and B.T., inspected Angelica's home, spoke to

DCFS personnel and Angelica's parenting coach, and reviewed "extensive" records. Based on her analysis of relevant information, Dr. Perry opined that Angelica's "developmental disabilities do not hinder her ability to parent B.T. with support in place." The written report that she completed reflecting that opinion was entered into evidence.

¶ 27 On cross-examination, Dr. Perry acknowledged that she was compensated for her work on the case. She recalled that she testified in a different juvenile court case before another judge in the building, but she "wouldn't know" whether or not that judge found her testimony to be biased or lacking in credibility. When asked additional questions about her opinion of Angelica's parenting abilities, Dr. Perry conceded that Angelica cannot parent independently and that she would "benefit from having someone in her life that can help her make decisions." She further conceded that Angelica's "extremely low range" intellectual functioning impairs her ability to appreciate both short-term and long-term consequences of her actions and makes it difficult for her to "identify[] negative influences." Dr. Perry emphasized, however, that one of Angelica's strengths is "her ability to recognize her limitation[s] and rely on the assistance of others." In addition, she expressed her belief that Angelica possesses the capacity to support B.T. emotionally. Dr. Perry acknowledged that prior to completing Angelica's parenting assessment, she never spoke to Tracy or other members of B.T.'s foster family to ascertain their thoughts and observations about B.T.'s interactions with Angelica.

¶ 28 Andres T., B.T.'s maternal grandfather, a native Spanish-speaker, testified through an interpreter, that he recalled the occasion on which B.T. suffered a burn during a supervised visit at his residence. At the time of the burn, he was barbecuing in the backyard and Angelica was with B.T. in the kitchen. Although he was supposed to have been supervising the visit, Andres acknowledged that he left his daughter unsupervised for "[m]aybe three minutes" with B.T, during

which time she was burned.  When he observed the burn, he treated it with Aloe Vera, burn cream, and covered it with gauze.  He denied that he was drinking that day and testified that he does not drink.   He admitted that Angelica asked him to take B.T. to the hospital; however, he did not do so because he "did not see [B.T.'s injury] as being a third-degree burn."  Andres denied that DCFS caseworker Jimenez ever instructed him to report any injuries that B.T. suffered in his home during a visit.  He further denied that Jimenez detailed his exact responsibilities as the designated supervisor of a visit between Angelica and B.T.  Andres admitted that he has previously threatened to evict his daughter from the family home.  He explained, however, that he only did so out of anger caused by work-related pressure.

¶ 29     DCFS child welfare specialist, Moises Jimenez, was called to deliver additional testimony about the burn incident.  Jimenez testified that he saw B.T. several weeks after she suffered the burn and at that time, she was "healing very properly."  He did not specifically recall whether he spoke to Andres after B.T. was burned.  Jimenez, however, did recall that he had spoken to Andres before the burn incident and had informed Andres of his responsibilities as a designated supervisor of a visit between his daughter and B.T.  Specifically, he had instructed Andres to always have "eyes on" B.T. during a visit and that he was required to inform DCFS if anything happened to B.T. during a visit.  Andres did not abide by those instructions during the visit on which B.T. sustained her burn injury.  As a result, following that visit, DCFS required a non-family member to supervise all future visits between Angelica and B.T.

¶ 30     John Bedalow, a parent coach with Mary and Tom Leo Associates, testified that he provided parent coaching and training to Angelica from November 2016 until May or June 2017.  During the weekly one-hour coaching sessions, Bedalow sought to provide Angelica with a skill set that would allow her to interact with her daughter on a "basic" level in order to establish and

facilitate a healthy parent-child relationship. Angelica's family was often present during Angelica's visits with her daughter. Bedalow found them to be "very affectionate" with B.T. Angelica's mother, Evelyn, was particularly involved during visits; however, Bedalow recalled occasions where he requested her to leave the room so that Angelica could interact with her daughter by herself. In Bedalow's opinion, Angelica's parenting behavior during the visits "was always okay" and "generally very good." She ensured that B.T. was provided with a snack or meal and used toys to engage her daughter in play. Moreover, Bedalow opined that Angelica appeared to be "pretty motivated to try to learn" parenting skills. During the time that he worked with Angelica, Bedalow completed several assessments of her parenting skills. Those documents were entered into evidence.

¶ 31    Evelyn, Angelica's mother, testified that she recalled the visit where B.T. was given bananas as a snack; however, she denied that B.T. was ever given five bananas at one time. Based on her recollection, she gave B.T. one banana and when B.T. threw part of that banana away, Evelyn gave her the tip of another banana. Her daughter was not the one who provided B.T. with the bananas.

¶ 32    Following Evelyn's testimony, Angelica's attorney rested and the parties delivered closing arguments concerning Angelica's parental fitness. After hearing the evidence and the arguments of the parties, the court found Angelica to be an unfit parent as that term is defined in the Juvenile Court Act. Specifically, in its oral ruling, the court found that Angelica was unfit on two separate grounds delineated by statute: Ground M and Ground P. First, the court found Angelica unfit pursuant to Ground M because she "did not make reasonable progress toward reunification with B.T." Although Angelica did participate in parent coaching and obtained some services, the court did not believe that her progress was sufficient such that B.T. could be returned to her care in the

near future. The court further found Angelica unfit pursuant to Ground P because her mental impairment rendered her unable to discharge her parental responsibilities. In so finding, the court highlighted the report completed by Dr. Agrawal wherein she opined that Angelica's lifelong and untreatable intellectual disability prevented her from possessing the necessary problem-solving and decision-making skills to be a successful parent and rendered her incapable of developing the requisite skills to be able to successfully discharge her parental responsibilities on a long-term basis. The court further found that "given the dysfunctional nature of [Angelica's] family and the problems that this family has ha[d] in the past, [it did not] have any confidence that the grandparents can step up to provide the necessary support system that [Angelica] will need in order to raise [B.T.] in a safe and appropriate manner."

¶ 33                                  Best Interest Hearing

¶ 34     The cause then proceeded to a best interest hearing, where the court took judicial notice of the evidence presented at the fitness hearing. Witnesses were then called to deliver additional testimony.

¶ 35     At the time of the hearing, B.T. was four-years-old and DCFS caseworker Jimenez described her as a "very active" "always smiling" Latina child. He testified that B.T. has been in the care of her foster mother, Tracy, since July 7, 2015, and that he has never observed any signs of abuse, neglect, or corporal punishment while B.T. has lived with Tracy; rather, he has always found her placement to be safe and appropriate. During the time that she has lived with Tracy, B.T. has received appropriate medical, dental, and vision care. B.T. is currently attending pre-K school and is receiving speech therapy. Jimenez opined that B.T. is "very bonded" to her foster mother and noted that she refers to Tracy as "Mommy." Moreover, B.T. has "very positive" interactions with the other members of Tracy's household as well. He noted that Tracy's parents

care for B.T. when Tracy is at work and that B.T. is "very used to them" and "very bonded with them as well." In addition, B.T. treats Tracy's biological daughter as an older sister and "tries to copy everything" she does. Jimenez confirmed that Tracy has expressed her desire to adopt B.T. and in his opinion, it would be in B.T.'s best interest for the court to permit that adoption to occur. He explained that B.T.'s foster placement has been "stable" and "nurture[ing]" and that she has "bonded with" Tracy. In contrast, B.T.'s bond with Angelica is "very cold." At the last visitation that he observed between Angelica and her daughter, B.T. resisted playing with her mother, walked away from her, and ordered Angelica "not to follow" her.

¶ 36    On cross-examination, Jimenez described Tracy as Caucasian. In contrast, B.T.'s maternal grandmother is Puerto Rican and her maternal grandfather is Mexican. B.T. does not speak Spanish and her grandfather does not speak English. Jimenez acknowledged that he asked Tracy to begin supervising visits between Angelica and B.T. in 2017. He explained that he did so to establish a better connection between Tracy, Angelica, and B.T. Jimenez explained that DCFS supports such arrangements because it creates a greater likelihood that a biological parent will have continued contact with the child in the event that the foster parent is permitted to adopt the child. Thus far, Tracy has expressed a willingness to continue to foster a relationship between B.T. and her maternal family in the event that she is permitted to adopt her. In Jimenez's opinion, it is important for "all kids that come into the system" to maintain some contact with their biological parents. He noted that Tracy has always been courteous toward Angelica and her family even though there has been some "discourteous" behavior on the "maternal side."

¶ 37    Tracy testified that she considers B.T., whom she has cared for since she was 10 months old, to be a "part of [her] family." B.T. calls Tracy "mom" and is very close to Tracy's 11-year-old biological daughter. The two girls are "inseparable." B.T. has also developed a "very close

relationship" with Tracy's parents, particularly Tracy's father. B.T. shares everything that she does with Tracy's father, who B.T. calls "papa." B.T. also refers to Tracy's mother as "grandma." Tracy likened the relationship that her parents have with B.T. to the one they share with her biological daughter. Tracy further testified that B.T. has also been integrated into her extended family and has attended birthday parties, holidays, and other family gatherings. B.T. refers to Tracy's brother as "uncle" and is standing up in an upcoming wedding for one of Tracy's cousins. During the time that B.T. has been in her care, B.T. has also established relationships with other children who attend her school and who live in the neighborhood.

¶ 38    Tracy testified that she has made efforts to foster B.T.'s Hispanic heritage. B.T.'s school is bilingual and Tracy's church has a Spanish-language service that she has attended with B.T. In addition, they "have attended lots of quinceaneras" because a number of Tracy's neighbors are Hispanic. Tracy confirmed that she wished to adopt B.T., explaining "she's part of our family, we love her, she fits right in with us."

¶ 39    Dr. Perry testified that she believed that B.T shares a bond with Angelica and opined that it was important for the court to consider legal options to maintain "consistent contact" between B.T. and Angelica. She explained that "often children who have been adopted become curious about who they are, where they come from. And so having that existing relationship and bond with [Angelica] will help [B.T.] integrate her identities in that way." Dr. Perry also opined that maintaining contact between Angelica and B.T. would be beneficial from a cultural perspective because Angelica could "help [B.T.] develop a positive self-esteem as a Latina." She agreed that B.T. also shared a bond with her foster family; however, she noted that B.T. appeared to interact with her biological family "very differently" in the presence of her foster mother. Dr. Perry

explained that she observed B.T. act affectionately with Angelica and Evelyn when Tracy was not present; however, she appeared to be "very mindful" of Tracy's reaction when she was nearby.

¶ 40    Aleida Chavez, an employee of Help at Home, testified that she was tasked with transporting B.T. from her foster home to visit with her biological family for approximately two years. On those occasions, Chavez would also supervise those visits. In her opinion, B.T. appeared to be "affectionate" with her biological family during those visits. Moreover, Chavez believed that Angelica is capable of caring for her daughter "with supervision."

¶ 41    Evelyn testified that she shares a bond with her granddaughter and noted that B.T. refers to both her and Angelica as "mommy." In her opinion, B.T. has "two mommies in the house" instead of a mommy and a grandmother. Evelyn expressed her desire to spend more time with her granddaughter because she believes that it is important for B.T. to really "know" her biological family. She noted that Angelica "gets so depressed" because she misses her daughter. Evelyn acknowledged that Tracy has contacted her to schedule visits between B.T. and Angelica, but testified that Tracy has refused to schedule visits on weekends instead of weekdays even though weekends work better for Evelyn's family's schedule. In addition, Evelyn has observed Tracy "yell at" and "pull" B.T. during some visits that she has supervised between B.T. and Angelica.

¶ 42    Angelica testified that she loves her "beautiful daughter" very much. She acknowledged that she has not visited her daughter for the past two months, but explained that she and her mother have been working on obtaining their GEDs and, as a result, they have been unable to attend visits that have been scheduled on weekdays. Thus far, Tracy has not permitted weekend visitations. Angelica testified that it has been hard for her to maintain a good relationship with her daughter because she has not been permitted to spend much time with her. She has also observed Tracy

"yell at" and "grab" B.T. during visits. She did not believe such behavior was appropriate. Angelica showed the court some pictures she has taken of her daughter.

¶ 43    Following Angelica's testimony, the parties delivered closing arguments. The State and Public Guardian both requested the court to terminate Angelica's parental rights and allow B.T. to be adopted by Tracy. Angelica's attorney, in turn, requested the court to establish a private guardianship so that Angelica would be afforded legal rights to maintain a relationship with her daughter. After reviewing the testimony presented and the arguments of the parties, the court elected to terminate Angelica's parental rights. In doing so, the court found that there was "no question" that Angelica had a "very strong love" for her daughter, but concluded that its review of all of the statutory best interest factors supported the termination of Angelica's parental rights so that B.T. could be adopted. This appeal followed.

¶ 44                                     ANALYSIS

¶ 45                          Fitness Finding

¶ 46    On appeal, Angelica disputes the propriety of various evidence admitted and purportedly considered by the circuit court at the fitness hearing. She first contends that the circuit court erred in admitting, at the State's request, an order completed by a judge in a different juvenile case finding that the testimony offered by Dr. Perry in that case to be biased and lacking credibility. She argues that the prior order entered in the unrelated case had "little bearing on Dr. Perry's credibility" as a witness in her case and that the court's admission of that exhibit was erroneous and prejudiced her.

¶ 47    The State agrees that the circuit court erred in admitting the exhibit, but argues that the error was "harmless where the properly admitted evidence overwhelmingly established that [Angelica] was unfit to parent" B.T. The Public Guardian, however, contends that the circuit court

did not abuse its discretion in admitting the exhibit, but argues that even if the court's ruling was erroneous, the error was "harmless because no substantial prejudice resulted."

¶ 48    Because an understanding of the Juvenile Court Act and the procedures outlined therein is important to evaluate the specific arguments raised by Angelica on appeal, we will first provide a brief overview of the Act and the provisions relevant to this appeal before addressing the substantive merit of her claims.

¶ 49    The overarching purpose of the Juvenile Court Act is to protect and ensure the safety, emotional, mental, and physical welfare of minor children in a manner that best serves the best interests of those children, their families, and the community. *Julie Q. v. Department of Child and Family Services*, 2013 IL 113783, ¶ 39; *In re Austin W.*, 214 Ill. 2d 31, 43 (2005); 705 ILCS 405/1-2(1) (West 2014).  Proceedings under the Act are civil and nonadversarial (*Julie Q.*, 2013 IL 113783, ¶ 390), and are not designed to assign liability to any party (*In re R. B.*, 336 Ill. App. 3d 606, 614 (2003)); rather the " 'paramount consideration' " of any proceeding initiated under the Act is to ensure that a child's best interest is being protected (*In re N.B.*, 191 Ill. 2d 33, 343 (2000) (quoting *In re K.G.*, 288 Ill. App. 3d 728, 734-35 (1997)).  Because "[a] biological parent's right to raise his or her child is a fundamental liberty interest" (*In re Gwynne P.*, 215 Ill. 2d 340, 353 (2005)), Illinois law favors natural parents retaining custody of their children (*In re Haley D.*, 2011 IL 110886, ¶ 90).  Nonetheless, the Act acknowledges that there are occasions where the "drastic measure" (*People v. Phyllis B.*, 231 Ill. 2d 459, 463 (2008)) of "permanently and completely" (*People v. Brenda T.*, 212 Ill. 2d 347, 356 (2004)) severing the natural parent-child relationship by terminating a biological parent's parental rights may be in the child's best interests.  In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is based on a two step-process set forth in the Illinois Juvenile Court Act (705 ILCS

405/1-1 *et seq*. (West 2012)) and the Illinois Adoption Act (705 ILCS 50/0.01 *et seq*. (West 2014)). See, *e.g.*, *In re Ca B.*, 2019 IL App (1st) 181024, ¶ 26; *In re J.L.*, 236 Ill. 2d 329, 337 (2010); *In re E.B.*, 231 Ill. 2d 459, 463 (2008). In accordance with that process, once a petition to terminate parental rights is filed in the circuit court pursuant to section 2-29 of the Juvenile Court Act, the cause proceeds first to a fitness hearing. 705 ILCS 405/2-29 (West 2014); *In re J.L.*, 236 Ill. 2d at 337; *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 63. If, at the conclusion of the fitness hearing, the court finds by clear and convincing evidence, that the parent is unfit, as that term is defined in section 1 of the Adoption Act, the cause then proceeds to a best interest hearing where the court is called upon to ascertain the permanency placement option that is in the child's best interests. 705 ILCS 405/2-29(2), (4) (West 2014); 750 ILCS 50/1(D) (West 2014); *In re J.L.*, 236 Ill. 2d at 337; *Julian K.*, 2012 IL App (1st) 112841, ¶ 63.

¶ 50 Having set forth the relevant statutory framework, we now address the substantive merit of Angelica's argument that the circuit court erred in admitting evidence at her fitness hearing. As a general rule, the admissibility of evidence is within the discretion of the circuit court, and as such, an evidentiary ruling will not be disturbed absent an abuse of that discretion. *In re A.W.*, 231 Ill. 2d 241, 256 (2008). To be admissible, evidence must be relevant and either prove a fact in controversy or render a matter at issue more or less probable. *Id.* Because the credibility of a witness called upon to testify in a court proceeding is always relevant, it is appropriate to challenge a witness's credibility by introducing evidence that shows that the witness provided testimony inconsistent with her trial testimony on a prior occasion. *Smith v. Silver Cross Hospital*, 339 Ill. App. 3d 67, 72 (2003).

¶ 51    In this case, the State sought to challenge the credibility of Dr. Perry, Angelica's expert witness, by inquiring about testimony she provided in another juvenile court proceeding. Specifically, the State inquired:

"[STATE]:  Have you testified in court proceedings in this building before?

[Dr. Perry]: Yes.

[STATE]: Do you know approximately how many times?

[Dr. Perry]: In this building?

[STATE]: Correct.

[Dr. Perry]: Once.

[STATE]: And during that proceeding, was your testimony ever found to be not credible?

[Dr. Perry]: I wouldn't know.

[STATE]:  Do you know whether—when you testified in that case, was it in front of Judge Murphy?

[Dr. Perry]: Yes.

[STATE]: And do you know whether or not your testimony was found to be bias[ed] in that case?

[Dr. Perry]: No.

[State]: No, you don't know or no it was not?

[Dr. Perry]: No, I don't know."

¶ 52    Thereafter, the State sought to introduce an order entered by Judge Murphy in the unrelated juvenile case wherein he made the following finding regarding the credibility of the expert witnesses who testified in the case, one of whom was Dr. Perry: "Two expert witnesses, Sonja

Ulrich, MSW and Dr. Darlene Perry, PhD testified for the father. Both were critical of the JPA report. While the court respects the credentials of these experts, the court has serious issues with their credibility. Each came across in her testimony, as well as in the written reports, as being advocates for the father rather than neutral, objective, professional witnesses. Their demeanor on the stand reflected their biases." Angelica's attorney objected to the admission of the exhibit on relevance grounds, arguing that another judge's credibility finding in an unrelated case had no bearing on the credibility of Dr. Perry's testimony in the instant case. After considering the arguments of the parties, the court observed that it had taken notes of Dr. Perry's testimony and had found her to be a "very credible" witness. Nonetheless, the court granted the State's request to admit the exhibit and indicated that it would "consider" it.

¶ 53 On review, we find that the admission of the exhibit was erroneous. Although a witness's credibility is always relevant, there was no suggestion by any party that Dr. Perry was a biased witness or that she lacked credibility in the instant case. Indeed, the opinion that Dr. Perry offered about the effect of Angelica's cognitive delays on her ability to safely and effectively parent B.T. paralleled that offered by the State's expert, Dr. Agrawal. That is, both experts agreed that Angelica's cognitive limitations prevented her from being able to safely parent B.T. alone. Moreover, when asked about her knowledge of any adverse credibility findings against her in other cases, Dr. Perry did not deny that such findings were made; rather, she simply indicated that she "wouldn't know" if another judge had deemed her testimony biased. As such, the use of the exhibit to "impeach" her was improper. See *Smith*, 339 Ill. App. 3d at 72 (recognizing that "[b]efore any impeachment can occur, the witness must first testify in a manner *inconsistent* with h[er] prior out-of-court testimony") (Emphasis added).

¶ 54    Although we find that the circuit court erred in admitting the exhibit, we find that the error was harmless because it is apparent from the record that the admission of the State's exhibit did not prejudice Angelica or materially affect the outcome of the fitness hearing.  See *In re April C.*, 326 Ill. App. 3d 245, 261-62 (2001) (quoting *Phillips v. Britton*, 162 Ill. App. 3d 774, 786 (1987) (" 'As a general rule, error in the exclusion or admission of evidence is harmless and does not require reversal if there has been no prejudice or if the evidence has not materially affected the outcome of the trial.' ").  Initially, we note that at the conclusion of the fitness hearing, the circuit court provided a detailed explanation for its finding that Angelica was an unfit parent.  In doing so, the court highlighted testimony it had heard, documents it had reviewed, and pertinent case law.  The court never referenced the exhibit and there was no indication that the exhibit had an impact on the court's credibility determinations or its conclusion that Angelica was an unfit parent.  Moreover, as set forth above, the court found Angelica unfit on two separate statutory grounds: Ground M and Ground P.  That is, the court found that Angelica was unfit because she had failed to complete services and failed to make reasonable progress toward B.T.'s return home (Ground M) and because her disability rendered her unable to discharge her parenting responsibilities (Ground P).  Dr. Perry's testimony and the report she submitted in the case solely pertained to Ground P and the effect of Angelica's cognitive impairment on her ability to parent.  Because the statutorily delineated grounds for unfitness are independent (*In re M.W.*, 2019 IL App (1st) 191002, ¶ 56), even if the exhibit had any impact on the court's consideration of Dr. Perry's testimony with respect to Ground P, there is no evidence that the exhibit influenced the court's finding that Angelica had failed to make reasonable progress toward B.T.'s return home and was unfit pursuant to Ground M.  Accordingly, the erroneous admission of the exhibit was necessarily harmless.

¶ 55    Next, Angelica argues that the court relied on improper evidence to find her unfit. Specifically, she argues that the court improperly cited her lack of appropriate decision-making skills with respect to "paramour[s]" as a basis to support its unfitness finding.  She contends that the court's reference to a previous boyfriend was a topic discussed in mediation, but not introduced as evidence in the fitness hearing and as such, the court reliance on such evidence was improper.

¶ 56    The State and Public Guardian both contend that the court's fitness findings were not premised on evidence revealed solely in mediation and that the evidence that was properly admitted at the fitness hearing provided ample support for the circuit court's conclusions about Angelica's lack of judgment and questionable decision-making.

¶ 57    Initially, Angelica acknowledges that she failed to object to the court's discussion of her questionable decision-making in the context of her romantic relationships and that she thus failed to properly preserve this issue for review.  See, *e.g., In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 16 (mother forfeited claim for review when she failed to raise it in the circuit court during the termination proceedings); *April C.*, 326 Ill App. 3d at 242 ("Where a party fails to make an appropriate objection in the court below, he or she has failed to preserve the question for review and the issue is waived").  In an effort to excuse her procedural default, Angelica invokes the plain error rule.  Most commonly employed in criminal cases, the plain error doctrine may nonetheless be invoked in civil cases to address an issue affecting the fundamental fairness of a proceeding. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *In re M.W.*, 232 Ill. 2d 408, 430 (2009); *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 30.  Application of the plain error doctrine in civil cases, however, should be " 'exceedingly rare,' " (*Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 856 (2010) (quoting *Palanti v. Dillon Enterprises, Ltd.*, 303 Ill. App. 3d 58, 66 (1999)).  It is appropriate " 'only where the act complained of was a prejudicial error so egregious that it deprived the complaining party

of a fair trial and substantially impaired the integrity of the judicial process.' " *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 627 (quoting *Lange v. Freund*, 367 Ill. App. 3d 641, 649 (2006)). Given that the termination of parental rights affects a fundamental liberty interest (*In re Brandon L.*, 348 Ill. App. 3d 315, 320 (2004)), we will review Angelica's claim pursuant to the plain error doctrine. See, *e.g., In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 30.

¶ 58    Cook County Circuit Court Rule 19A.19 sets forth the governing rules for the Child Protection Mediation and Facilitation Program, including the confidentiality of mediation communications.  Specifically, section (ix) states that "all mediation communications occurring during the course of the Child Protection mediation or facilitation process shall remain confidential in accordance with the terms of the Uniform Mediation Act."  The rule further provides that "[p]ursuant to the Uniform Mediation Act, 710 ILCS 35/1 et seq., mediation communications are privileged against disclosure and not subject to discovery or admissible in evidence in a juvenile, administrative, arbitral, or other adjudicative process, including related pre-hearing and post-hearing motions, conferences, and discovery. *** Evidence or information that is otherwise admissible or subject to discovery does not become inadmissible or protected from discovery solely by reason of its disclosure or use in mediation." *Id*. (v.)

¶ 59    During the fitness hearing, DCFS caseworker Jimenez testified that there was a point in time where Angelica had moved to Wisconsin for two months to live with a man with whom she was having a romantic relationship.  She later told him that the man had previously been living with her at her parents home.  Because Angelica had not been forthcoming about her relationship at the time, DCFS was not afforded an opportunity to investigate the man and the Department was unaware that Angelica had left the state for a period of time.  Angelica's attorney objected to Jimenez's testimony about Angelica's relationship and her living situation, arguing that Jimenez

received that information during mediation and that the evidence was thus not properly before the court. The circuit court agreed, stating: "[O]rdinarily, information that's [a] part of that mediation is privileged and not admissible in evidence. I think it's best that I disregard that, unless it's proven otherwise. I mean, the State or the Guardian can call mother and ask her about it, but at least for now, I'm going to disregard the testimony that mother left Illinois and went to Wisconsin." Thereafter, in delivering its fitness ruling, the court spent a significant amount of time examining how Angelica's cognitive issues impact her ability to parent. The court noted that Dr. Agrawal's report found that Angelica "has not shown appropriate problem solving or decision making skills in parenting [B.T.] as well as in other areas such as with paramours." The court then went on to state: "If I recall correctly, the record shows that [Angelica] for a period of time moved to Wisconsin to live with—a male paramour who was on parole, and there was some talk that she felt that perhaps he might be an appropriate father to adopt the child. And it just demonstrates a lack of judgment to protect her daughter."

¶ 60    After examining the record, it is apparent that the court was presented with various evidence concerning the impact of Angelica's cognitive delays on her ability to employ appropriate decision-making skills in various context, including in her interpersonal relationships. For example, in Dr. Agrawal's written report that was entered into evidence, she opined that Angelica "has not shown appropriate problem solving or decision[-] making skills in parenting [B.T.] as well as in others, such as paramours." As an example, Dr. Agrawal noted that Angelica had expressed her desire that her "current paramour" be permitted to adopt B.T. She found Angelica's judgment in this area to be both "unrealistic" and inappropriate because B.T. did not know the man and Angelica did "not know if he w[ould] be an appropriate caregiver to her child." Dr. Perry, in turn, testified at the fitness hearing that Angelica's cognitive limitations prevent her from being

able to identify people who may be negative influences in her life. Similarly JPA psychologist Siegel opined that Angelica was "easily influenced" by people around her. Although the court's specific reference to Angelica's decision to move to Wisconsin to be with a paramour does not appear in the record on appeal submitted in this case, the record does, as shown above, contain evidence to support the court's finding that Angelica's cognitive delays negatively impact her judgment and her ability to make appropriate decisions in the context of her romantic and other interpersonal relationships. Therefore, to the extent that the circuit court erred in referencing Angelica's decision to briefly relocate to Wisconsin to live with a boyfriend, we cannot agree that the error was so egregious and prejudicial that it affected the integrity of the judicial process and deprived Angelica of her right to a fair hearing and amounted to plain error. See generally *In re M.S.*, 2018 IL App (1st) 172659 (no plain error where the purported error was not critical to or potentially dispositive of the trial judge's decision).

¶ 61     Best Interest Finding

¶ 62     Finally, Angelica contests the circuit court's best interest finding and argues that the court's conclusion that it was in B.T.'s best interest to terminate her parental rights is against the manifest weight of the evidence. Specifically, Angelica suggests that an analysis of the relevant best interest factors supports the conclusion that a guardianship arrangement that guaranteed the continuation of the mother-child relationship rather than the termination of her parental rights "would have been the most appropriate result."

¶ 63     The State and Public Guardian both submit that the circuit court's conclusion that the termination of Angelica's parental rights was in B.T.'s best interests is supported by the manifest weight of the evidence.

¶ 64 At a best interest hearing, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Accordingly, because a parent's lack of fitness to have physical custody of her child does not automatically mean that termination of her parental rights is in the best interest of that child (*In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 18; *In re M.F.*, 326 Ill. App. 3d 1110, 1115 (2002)), it is incumbent upon the State to prove by a preponderance of the evidence that the termination of parental rights is in "the best interest" of the child. 705 ILCS 405/2-29(2) (West 2014); *In re J.L.*, 236 Ill. 2d at 337-38; *In re Gwynne P.*, 215 Ill. 2d at 354; *In re N.T.*, 2015 IL App (1st) 142391, ¶ 28. When called upon to make a determination regarding a minor's best interest, the circuit court is required to "to look to all matters bearing on [the child's] welfare," including the factors delineated in section 1-3 of the Juvenile Court Act. 705 ILCS 405/1-3 (4.05) (West 2014); *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. Pursuant to that provision, "the trial court is required to consider and balance [the] different factors, and to do this multifactor-balancing while keeping in mind the child's age and developmental needs." *Julian K.*, 2012 Ill App (1st) 112841, ¶ 81. Specifically, section 1-3 provides as follows:

"Whenever a 'best interest' determination is required, the following factors shall be considered in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel love, attachment, and a sense of being loved);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3 (4.05) (West 2014).

¶ 65    Although the court must consider each of these factors in ascertaining the best interest of the child, no single statutory factor is dispositive. *In re Austin W.*, 214 Ill 2d 31, 50 (2005); *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.   Moreover, the court need not make explicit reference to each of these factors when setting forth its best interest finding.  *In re N.T.*, 2015 IL App (1st) 142391, ¶ 28; *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.   In addition to these statutory factors, our supreme court has instructed that "[o]ther important considerations when deciding a child's best interests are 'the nature and length of the child's relationship with the

present caretaker' and the effect a change of placement would have upon the emotional and psychological well-being of the child." *Austin W.*, 214 Ill. 2d at 50 (quoting *In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991)).  Ultimately, a trial court's best interest determination will not be reversed unless it is against the manifest weight of the evidence.  *In re N.T.*, 2015 IL App (1st) 142391, ¶ 28; *Julian K.*, 2012 IL App (1st) 112841, ¶ 64.  "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the lower court's determination is 'unreasonable, arbitrary, or not based on [the] evidence presented.' " *In re Angela D.*, 2012 IL App (1st) 112887, ¶ 28 (quoting *In re J.Y.*, 2011 IL App (3d) 100727, ¶ 21).

¶ 66      Here, the record reveals that the circuit court engaged in a thoughtful and comprehensive analysis of the best interest factors in determining that the termination of Angelica's parental rights was in B.T.'s best interests and we are unable to conclude that its finding is against the manifest weight of the evidence.  The evidence presented at the best interest hearing established that B.T., who was removed from Angelica's physical custody shortly after her birth, has spent the majority of her childhood in Tracy's care.  During that time, Tracy has provided B.T. with love and stability and has ensured that her physical, medical, educational, and emotional needs were met on a consistent basis.  There is no dispute that Angelica loves and shares a bond with her daughter and we acknowledge that Angelica and members of her family have made efforts to maintain a relationship with B.T. while she has been in Tracy's care.  We emphasize, however, that the mere existence of a bond between a child and her natural parent, standing alone, does not support a finding that termination of the parent's parental rights is against the manifest weight of the evidence. See, *e.g., N.T.*, 2015 IL App (1st) 142391, ¶ 29; *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 22; *Angela D.*, 2012 IL App (1st) 112887, ¶ 39;  *Julian K.*, 2012 IL App (1st) 112841, ¶ 83. Moreover, we note that the record reflects that B.T. has also developed a strong bond with Tracy.

DCFS caseworker Jimenez opined that B.T. is "very bonded" to her foster mother and referred to Tracy as "Mommy." The record also demonstrates that B.T. has also established a bond with members of Tracy's extended family, especially Tracy's biological daughter, brother, and parents. For example, Jimenez testified that B.T. is also "very bonded" to Tracy's parents, who care for B.T. while Tracy is at work and Tracy testified that B.T. refers to her father as "papa" and her mother as "grandma." We further observe that Tracy has expressed a willingness to facilitate a continued relationship between Angelica and B.T. if she were permitted to formally adopt her. Although a biological parent is not guaranteed future contact with her child once her parental rights are terminated, courts have nonetheless considered a foster parent's willingness to allow continued contact between the child and natural parent when making a determination as to the child's best interests. See, *e.g., Tajannah O.*, 2014 IL App (1st) 133119, ¶ 23; *Angela D.*, 2012 IL App (1st) 112887, ¶ 41; *Julian K.*, 2012 IL App (1st) 112841, ¶ 83.

¶ 67 Ultimately, after reviewing the record and the pertinent best interest factors, we are unable to conclude that the circuit court's decision to terminate Angelica's parental rights is against the manifest weight of the evidence. Rather, we agree with the circuit court that it is in B.T.'s best interests to allow her to be adopted by her foster mother Tracy, who has cared for her since her infancy and with whom she has established a stable and loving bond. In so finding, we necessarily reject Angelica's argument that the establishment of a guardianship arrangement rather than the termination of her parental rights would be the "most appropriate result."

¶ 68 We acknowledge that the Juvenile Court Act permits courts to consider a variety of permanency options at a best interest hearing "ranging from reunification with the parent, to some sort of transfer of guardianship or wardship to another person, to adoption." *Tajannah O.,* 2014 IL App (1st) 133119, ¶ 33. The permanency goals of return home and adoption, however, are "

'statutorily preferred' over private guardianship and, in order for such an alternative to be available, a trial court must first simultaneously exclude both the minor's return home and, at the same time, the termination of the parents' rights." *Id*. (quoting *In re Jeffrey S.*, 329 Ill. App. 3d 1096, 1103 (2002)). "Adoption is given preference over guardianship when the natural parent cannot give proper care because adoption better insures the child's stability and permanency in a safe, comfortable environment." *In re Julieanna M.*, 2018 IL App (1st) 172972, ¶ 21.

¶ 69    In this case, the circuit court specifically found that permitting B.T. to remain in Tracy's care, where she had resided for "nearly her entire life" was the "least disruptive" placement option available. Moreover, the court found that B.T.'s "need for permanence" and "need for stability" supported "a finding of best interest to terminate parental rights." Given that adoption is statutorily preferred, we are unable to conclude that the circuit court's conclusion that it was in B.T.'s best interest to terminate Angelica's parental rights and permit her to be adopted by Tracy is against the manifest weight of the evidence. Indeed, because the circuit court's analysis of the best interest factors, especially B.T.'s need for permanence, supported its conclusion that it was in her best interest to terminate her mother's parental rights, the court could not have even entertained an alternative guardianship arrangement. See *Tajannah O.*, 2014 IL App (1st) 133119, ¶¶ 33-34 (emphasizing that a guardianship arrangement is only available when the trial court determines that the minor should not be returned home and that the parent's rights should not be terminated and adoption should not take place and that a court does not err in failing to consider a guardianship arrangement where it is unable to first rule out adoption as being in a minor child's best interests). Therefore, we affirm the circuit court's best interest ruling.

¶ 70    CONCLUSION

¶ 71    The judgment of the circuit court is affirmed.

¶ 72    Affirmed.